The STATE of Ohio, Appellee,

v.

MANNS, Appellant.

[Cite as *State v. Manns,* 169 Ohio App.3d 687, 2006-Ohio-5802.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2005 CA 131.

Decided Nov. 3, 2006.

690

William H. Lamb, for appellee.

David E. Smith, for appellant.

DONOVAN, Judge.

{¶ 1} Renada Manns was convicted by a jury in the Clark County Court of Common Pleas of one count each of felony murder, in violation of R.C. 2903.02(B); aggravated robbery, in violation of R.C. 2911.01(A)(3); involuntary manslaughter, in violation of R.C. 2903.04(A); and theft, in violation of R.C. 2913.02(A)(1). At sentencing, the state elected to proceed on the charges of murder and aggravated robbery. Manns was sentenced to 15 years to life on the murder charge and to ten years on the aggravated-robbery charge, to be served consecutively.

{¶ 2} According to the state's evidence, on June 7, 2005, Alicia McAlmont took her sister's rented Ford Taurus and drove with three companions—Mahogany Patterson, Toneisha Gunnell, and Renada Manns—to the Upper Valley Mall in Springfield, Ohio. The women went to several stores, including Old Navy, and they took several items without paying for them. The women apparently placed the items from Old Navy in the trunk of their car. Patterson, McAlmont, and Gunnell returned to the mall to continue shoplifting at Macy's while Manns waited outside in the car. While Manns's companions were in Macy's, the vehicle was parked at the northern set of doors, parked along the curb and facing in the wrong direction.

{¶ 3} At approximately 3:30 p.m., the three women ran out of Macy's with several items of clothing on hangers and entered the vehicle. Chris Clarkson, a Macy's loss-prevention officer, emerged from the doors near the security office and attempted to apprehend them. At the same time, John Deselem was returning to the mall after retrieving his girlfriend's purse from their car, which was parked in a handicap space across from the southern set of doors into Macy's. As the women sped off in their vehicle, Deselem waved his arms at them in an effort to stop them. Manns hit Deselem with the car, resulting in fatal injuries. Manns drove out of the mall parking lot without stopping or slowing down.

{¶ 4} Shortly afterward, the Taurus was located in the ditch along Cardinal Drive with numerous articles of clothing in the back seat and in the trunk.

Manns's, McAlmont's, and Gunnell's palmprints and fingerprints were located in several places on the vehicle and on other items left in the car. The following day, Manns, McAlmont, Gunnell, and Patterson each surrendered to the police department in Columbus, Ohio.

{¶ 5} On June 20, 2005, Manns, McAlmont, Gunnell, and Patterson were indicted for murder, aggravated robbery, involuntary manslaughter, and theft. On November 1–4, 2005, they were tried together. As stated above, Manns was convicted of each count, and she was sentenced for murder and aggravated robbery accordingly.

{¶ 6} Manns appeals from her convictions for felony murder and aggravated robbery, raising five assignments of error. We will address them in an order that facilitates our analysis.

{¶ 7} II. "The trial court erred in not granting appellant's motion for judgment of acquittal because the state produced insufficient evidence to support a finding that appellant's driving was 'reckless.'"

{¶ 8} III. "Appellant's convictions are against the manifest weight of the evidence."

{¶ 9} In her second and third assignments of error, Manns claims that her convictions for murder and aggravated robbery were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 10} "' "[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed.1990) 1433. When reviewing a claim as to the sufficiency of evidence, we determine whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 11} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins,* 78 Ohio St.3d at 387,

678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 12} On appeal, Manns claims that the state presented insufficient evidence that she had acted with the necessary mental state for aggravated robbery when she inflicted serious physical harm upon Deselem. She therefore argues that her convictions for aggravated robbery and felony murder should be reversed.

{¶ 13} The aggravated-robbery statute states: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]inflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A)(3). Under the felony murder statute, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Aggravated robbery is a first-degree felony.

{¶ 14} The aggravated-robbery statute does not expressly state the requisite mental state for the offense. The Eighth District has articulated the culpable mental state as follows: "R.C. 2911.01, by making reference to the definition of a 'theft offense' in R.C. 2913.01, incorporates the 'knowingly' standard of culpability from the theft statute. However, this standard applies only to the theft aspect of the offense. The standard applicable to the infliction or attempted infliction of serious physical harm is not specified in the statute. Courts have therefore applied 'recklessly' as the standard of culpability for the infliction or attempted infliction of harm aspect of the offense." *State v. McSwain* (1992), 79 Ohio App.3d 600, 606, 607 N.E.2d 929; see, also, *State v. Patterson*, Washington App. No. 05CA16, 2006-Ohio-1902, 2006 WL 998205; *State v. Gillard* (Mar. 3, 2000), Erie App. Nos. E–97–132, E–98–038, 2000 WL 234657; *State v. Crawford* (1983), 10 Ohio App.3d 207, 208–209, 10 OBR 280, 461 N.E.2d 312; R.C. 2901.21(B). Based on this authority, the trial court instructed the jury that the state was required to prove that Manns recklessly inflicted serious physical harm upon Deselem.

{¶ 15} "Recklessly" is defined by R.C. 2901.22(C) as follows: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

{¶ 16} Manns asserts that reckless driving requires more than proof of excessive speed. Citing *State v. Whitaker* (1996), 111 Ohio App.3d 608, 676 N.E.2d 1189, she contends that the state must also establish driver impairment, erratic driving, an unsafe vehicle, or loss of control. Manns claims that the state did not present *any* evidence, including evidence of excessive speed, to support the conclusion that she was driving recklessly when Deselem was hit.

{¶ 17} Several persons witnessed the Ford Taurus depart from the Upper Valley Mall on June 7, 2005. Delores Douglas testified that she had been at the mall to do some shopping. As she was leaving through Macy's middle set of doors, she observed a car parked near the north doors and saw some women run from the store and get into the car. Douglas then saw a Macy's security guard running in the street toward the car. Douglas testified that as the car drove off, Deselem stood facing the car and was waving his arms in an effort to get the car to stop. Douglas stated that the car did not slow down either prior to hitting Deselem or afterwards.

{¶ 18} Rachel Cunningham, who worked as an independent contractor for the mall, was leaving the mall with her 13–year–old sister, Amy. On that day, Rachel had worked at Macy's. Rachel testified that after she finished her job, she and Amy went out the middle set of doors. As they were crossing the street, the security guard at Macy's ran past them. Rachel heard a car speed off, and then she heard a thump. Rachel turned around to check on Amy and saw Deselem on top of the car and rolling off. In a statement given to police officers that day, Amy indicated that the car might have dodged them and "we could tell [the car] wasn't trying to hit anyone."

{¶ 19} Shannon Elliott testified that as she was leaving Macy's with her young son in a stroller, a car was parked in front of the doors, facing the wrong direction and blocking her path. Elliott crossed to her vehicle, which was parked in the first spot by the doors and right beside the parked car. She waited in her car while her mother searched the mall for her son's blanket, which he had dropped. After approximately 15 minutes, Elliott observed three young women come running out of the store with clothes still on hangers. The women "jumped into the car, and the car accelerated." At this point, Elliott saw the Macy's security guard trying to get the driver to stop the vehicle. She testified that the car "just accelerated even more." Deselem then "stepped front of the car and

started waving his hands thinking that he could get the car to stop." Elliott stated that the car did not stop but instead accelerated and hit Deselem. She testified that after Deselem was hit, she could not tell which way the car turned because it had gone "so fast up the hill."

{¶ 20} Clarkson testified that while in the security office, he had observed three women moving suspiciously through the store, selecting various items. When the three women left the store without paying for the items, Clarkson left the security office, went outside through the customer pick-up doors, and headed into the parking lot. As he ran toward the north doors into Macy's, Clarkson saw the three women get into a tan-colored car. Clarkson testified: "As [the car] was driving by, I followed with my eyes, turned and watched it go away. As it went past me, it was going at a rapid speed or high rate of speed, and I saw Mr. Deselem standing in the middle of the roadway. I only saw him for a brief second before he got it. The car hit him and flipped him up on the top of the hood and forced him up on top of the windshield. Then he flipped off the side roof or the side of the car, off the driver's side." Clarkson testified that he did not see the car slow down at all.

{¶ 21} Manns notes that none of the eyewitnesses estimated the speed of the Ford Taurus in miles per hour at the time of impact and that there was no evidence as to the legal speed. Although the speed of the car was not quantified by the eyewitnesses, it was reasonable for the jurors to conclude, based on the evidence, that Manns and her companions left Macy's at an excessive speed. As stated above, several of the witnesses describe the vehicle as "speeding off" and Clarkson expressly stated that it passed him at a "high rate of speed." Moreover, Detective John Weis of the Columbus Police Department testified that McAlmont had admitted in her statement to him that after she had gotten in the car, she observed a person who she believed was a loss-prevention officer from one of the stores or a mall security guard approach the vehicle and that the vehicle "left rather abruptly."

{¶ 22} The jury's conclusion is buttressed by evidence about the effects of the impact. Mary Lockwood, who was driving north at the corner of Macy's when Deselem was hit, and Elliott both testified that upon impact, Deselem hit the windshield, went up into the air, and rolled on the asphalt until he came to a stop. Clarkson testified that Deselem was "very, very beat up," that there was "quite a bit of blood," and that he was "hit so hard that when he flipped off the car, it pulled his * * * shorts down to this ankles." Lockwood, who came to assist Clarkson after Deselem was hit, also testified that Deselem's shorts were down at his ankles when she got to him. Douglas further stated that Deselem's hat and one of his shoes were near her and he was "lying in a pool of blood." Upon discovery of the Taurus on Cardinal Drive, officers with the Clark County

Sheriff's Department located a red pen and a lipstick container, which had come from Deselem's girlfriend's purse, at the base of the windshield. A piece of Deselem's scalp was also found on the windshield. This evidence suggests that Deselem was hit with significant force.

{¶ 23} Dr. Robert Stewart, the pathologist and deputy coroner who performed the autopsy of Deselem, testified that Deselem had suffered an eggshell-like fracture on the back of his skull, another fracture at the middle of the base of his skull, and two small fractures over his eyes, in addition to contusions, abrasions, and lacerations of his scalp. One of the fractures severed his carotid artery, which caused significant blood loss. In addition, Deselem's fibula in his right leg was fractured. Stewart testified that if a person has healthy bones, fractures of the legs usually occur in speeds above 12 miles per hour. Stewart indicated, however, that the car could have been going at a much greater speed.

{¶ 24} Manns notes that there was no evidence that the parking lot was crowded or that there were many pedestrians. The eyewitnesses' testimony about the congestion of the parking area, both vehicular and pedestrian, was inconsistent. Amy Cunningham testified that she had greeted a friend of her father who was walking into Macy's as she and Rachel were walking out. Rachel did not recall this encounter, and she did not recall whether the parking lot was full. In her testimony, Douglas indicated that the parking lot "was somewhere between empty and full." She stated that Deselem was the only person that she saw in the street. However, Rachel had testified that she and Amy were in the road when Deselem was hit by the car. Lockwood testified that there were "not too many" cars in the parking lot that afternoon and that there was no traffic. Lockwood stated that she was not paying attention to other pedestrians. Clarkson stated that he did not recall any pedestrian traffic, but he explained that he was focused on the three women who had been shoplifting. In contrast, Elliott testified that she observed an older lady and two or three other ladies on the sidewalk when Deselem was struck. Finally, Clarkson testified that the entrances to Macy's are heavily traveled and that a lot of people park by Macy's and walk through the store to get into the mall. Clarkson further indicated that the parking is "fairly steady most of the time" and starts to thin out late at night. Although Clarkson testified that he was running down the sidewalk, Rachel and Douglas testified that he was running in the street.

{¶ 25} Despite the inconsistencies in the witnesses' testimony, the jury could have reasonably concluded that Manns was operating the vehicle recklessly when she hit Deselem and, thus, that she recklessly inflicted serious physical harm for purposes of the aggravated-robbery statute. According to the testimony, Deselem was returning to the southern doors into Macy's when Manns "sped off" from the northern doors toward him. Douglas and Elliott, both of whom saw Deselem

before he was struck, testified that they saw Deselem waving his arms in an effort to get the car to stop. The record supports the conclusion that Manns drove straight into Deselem without slowing down (and, possibly, while accelerating). In our judgment, that conduct demonstrated a perverse disregard of a known risk that her conduct was likely to cause serious physical harm to Deselem.

{¶ 26} Moreover, there was sufficient evidence from which the jurors could have concluded that Manns was driving at an excessive speed when she hit Deselem. It is clear that she was trying to elude apprehension for the shoplifting, and McAlmont indicated that they could see Clarkson, a loss-prevention officer, chasing after them. Although the witnesses vary in their testimony regarding how congested the mall parking lot was, it is clear that Manns sped away in a parking lot in the middle of the day while there were parked vehicles and some vehicular and pedestrian traffic nearby. Considering the totality of the circumstances, the jury could have reasonably concluded that Manns's conduct rose to the level of recklessness and not merely negligent driving.

{¶ 27} The second and third assignments of error are overruled.

{¶ 28} I. "Racial discrimination by the state in its use of its peremptory challenges violated appellant's rights under the Equal Protection Clause of the United States Constitution."

{¶ 29} In Manns's first assignment of error, she claims that she was denied her right to equal protection, as guaranteed by the United States Constitution, when the state used a peremptory challenge to strike the sole African–American prospective juror that was questioned.

{¶ 30} A state denies a black defendant equal protection when it puts her on trial before a jury from which members of her race have been purposefully excluded. *Batson v. Kentucky* (1986), 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69. Therefore, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Id. at 89, 106 S.Ct. 1712, 90 L.Ed.2d 69. In *Batson*, the United States Supreme Court created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated:

{¶ 31} "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." Id. at 82, 106 S.Ct. 1712, 90 L.Ed.2d 69; see *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140. In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecution used its peremptory challenge

specifically to exclude the prospective juror on account of his race. *Batson,* 476 U.S. at 95, 106 S.Ct. 1712, 90 L.Ed.2d 69; *State v. Williams,* Franklin App. No. 03AP–24, 2003-Ohio-5761, 2003 WL 22434597. The trial court must consider all relevant circumstances in determining whether a prima facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present. *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 32} Second, once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge "related to the particular case to be tried." Id. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. In fact, the prosecutor's explanation for striking the prospective juror is not required to be "persuasive, or even plausible." *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834. " 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " Id., quoting *Hernandez v. New York* (1991), 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395; see, also, *State v. Gowdy* (2000), 88 Ohio St.3d 387, 392, 727 N.E.2d 579.

{¶ 33} Third, the trial court must determine "whether the defendant had met his burden of proving purposeful discrimination." *Batson,* 476 U.S. at 82, 106 S.Ct. 1712, 90 L.Ed.2d 69. In making that determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible or instead is a pretext for unconstitutional discrimination. *Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859, 114 L.Ed.2d 395; *State v. Brown,* Montgomery App. No. 19236, 2003-Ohio-2683, 2003 WL 21210456. However, because this stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference. *Hicks v. Westinghouse Materials Co.* (1997), 78 Ohio St.3d 95, 102, 676 N.E.2d 872; *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859, 114 L.Ed.2d 395; *Miller–El v. Cockrell* (2003), 537 U.S. 322, 339–40, 123 S.Ct. 1029, 154 L.Ed.2d 931 ("Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to make credibility determinations").

{¶ 34} In the present case, prospective juror Cynthia Reynolds was called for her voir dire examination after the state had used four peremptory challenges and each of the defendants had used one. The prosecutor began the questioning by noting that he did not have a copy of her jury questionnaire and briefly asked

each of the questions covered by the questionnaire. In response to the question "Have you ever been a victim of a crime?" Reynolds responded that she had not been but that her daughter had. When asked what that incident involved, Reynolds stated that her daughter had been hit by an SUV. The prosecutor then asked whether anything about that experience would cause her problems with being fair and impartial. Reynolds responded negatively. The prosecutor did not ask Reynolds any details regarding her child's accident. The prosecutor then asked whether she had previously served on a jury, whether she had any close friendships with law-enforcement officers, whether she could follow the law as given in this case, and whether anything from the questioning of prospective jurors over the past several hours raised any concerns in her mind about her ability to be fair and impartial. Reynolds responded negatively to each of these questions. Upon the prosecutor's completion of questioning of Reynolds, the defense attorneys briefly questioned her as well.

{¶ 35} After the questioning of Reynolds by defense counsel was completed, a defense attorney exercised a peremptory challenge against a different prospective juror, and a new prospective juror, Ausra Gose, was called for questioning. After the state completed its questioning of Gose, the prosecutor requested permission to question Reynolds again "out of the normal sequence to follow up a couple of questions that I still have" based on "some of the answers of Mrs. Reynolds earlier." Counsel for Gunnell, McAlmont, and Manns objected. Gunnell's attorney argued that nothing in Reynolds's answers indicated that she was unable to make a fair and unbiased judgment. Manns' counsel argued that they had moved on to another prospective juror and that to allow the state's question would mean that questioning "should be opened up to ask any questions that come to mind on any other jurors that we may decide to question. I think that would make this thing go on for days." The prosecutor responded:

{¶ 36} "I would just indicate that as soon as last counsel was done, we went immediately to the next peremptory without the opportunity to pursue further. That had already happened prior to me being able to—there's a couple questions I'd like to, perhaps, clarify concerning some of the answers that she's previously given. I'm not actually moving on to anything that hasn't already been talked about."

{¶ 37} The court properly sustained the defense objection at this juncture and asked the state "to confine its questions at this time to Miss Gose." At the conclusion of the questioning of Gose, the state indicated that it would use a peremptory challenge to excuse Reynolds. Manns's counsel objected on that ground that Reynolds, the 23rd prospective juror, was the first African–American to come up.

{¶ 38} The state initially responded by stating that there had been no prima facie showing that it excused Reynolds on the basis of her race. The court rejected that contention and required the state to provide a race-neutral reason satisfactory under *Batson*. Because of that, and the court's subsequent ruling on the ultimate issue of discrimination, whether a prima facie case was established is now moot. *State v. White* (1999), 85 Ohio St.3d 433, 709 N.E.2d 140. However, as its race-neutral reason for excusing her, the prosecutor stated: "I was not allowed to get into that any further; but there was, perhaps, the Court is aware fairly famous situation where there were some minority kids that were struck by a vehicle. And those individuals that were victims of that have been very vocal about the lack of prosecution in that case threatening, I believe, even up to various lawsuits against the State of Ohio and particularly our office." It is both incorrect and disingenuous for the state to assert, "I was not allowed to get into that," when the state clearly initially chose not to ask any follow-up questions of Reynolds regarding the details of her child's accident that could have connected her to the protests of which the prosecutor spoke.

{¶ 39} Manns's counsel next questioned whether Reynolds was even part of any protest. The state responded that it had "tried to clarify that, but [the defense] stopped [it]." To suggest that the defense stopped the prosecutor from asking relevant questions is simply not supported by the record. The prosecutor failed initially to ask highly relevant and critical follow-up questions regarding Reynolds's child, and of course, the ruling regarding backtracking with additional questions to Reynolds was made by the judge, who appropriately manages voir dire. The prosecutor further elaborated that there had been protests in front of the courthouse, marches, and calls for his resignation. Further, he thought that Reynolds might be a part of the families involved, but was unable to say that she was, and went no further than that in the explanation he presented.

{¶ 40} The court found that the state had presented a race-neutral reason for exercising the peremptory challenge and excused Reynolds. The court explained:

{¶ 41} "The State has exercised a peremptory challenge; and typically with peremptory challenge, they're not required to give any reason why they use it. When counsel objects on *Batson* grounds, the State's required to provide a race neutral reason; and they've done that.

{¶ 42} "This Court is familiar with the facts of that case. I'm familiar with the group of African Americans that protested. That—that persecuted Mr. Schumaker, even though he went to extremes to have that case reviewed by independent counsel, by independent counsel that was African American; and there is no way the State of Ohio could get a fair trial with this person on the jury.

{¶ 43} "She's upset, obviously, that—and rightfully so—that her daughter's been injured, but her anger has been displaced toward the prosecutor's office [by] not prosecuting that case as a felony.

{¶ 44} "And it seems logical to the Court that she would look at this case and think why is the State so aggressively prosecuting these girls when they wouldn't prosecute the young man that injured her girl?

{¶ 45} "And that doesn't have anything to do with race. It—it may—it may have something to do with race in her mind as to why that's happened. But it's my opinion that the decisions made by the prosecutor's office in that case had nothing to do with the case and that their peremptory challenge in this case had nothing to do with race; but it has only to do with this prospective juror's position or familial relationship to the victim in that case."

{¶ 46} Manns's counsel then summarized (with sarcasm no doubt), the court's ruling, stating that "we don't know whether this juror in particular has participated * * * in any of the demonstrations or anything else. We do know that the NAACP has organized demonstrations against Mr. Schumaker, this being a group that advocates on behalf of people of African American descent. So what the Court's saying is there are people of African American descent [t]hat have protested against Mr. Schumaker, and she may be linked by family to one of the people who was involved in that, then * * * they're going to be allowed to throw her off, but it's race neutral. That's what I heard." The court responded that that was a race-neutral reason.

{¶ 47} Manns argues that the reason proffered by the state was race-based, and thus its use of a peremptory challenge on Reynolds was improper.

{¶ 48} This case is a textbook example of the importance of the record and the gatekeeping role of a judge when handling a *Batson* issue. It is also a classic case where preoccupation with the niceties of a three-step analysis should not foreclose meaningful appellate review.

{¶ 49} The state of Ohio's assumption or belief was that because this juror was African American and her child was involved in an accident with an SUV, she then must or may be associated with a group of African Americans that had protested against the prosecutor. Implicit in this explanation is the juror's race itself. We cannot merely assume that the prosecutor's explanation was advanced in good faith. The justification given was insufficient to dispel the existing inference of racial animus and was without any support in the voir dire record. Clearly, the challenge was made as a result of her race. A similarly situated Caucasian, Hispanic, or Asian would not have been placed in the same category as Reynolds. The United States Supreme Court has rejected the view that "no particular stigma or dishonor results if a prosecutor uses the raw fact of skin

color to determine the objectivity or qualifications of a juror * * *." *Powers v. State* (1991), 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411.

{¶ 50} The state of Ohio must be scrupulous in building a record that legitimately demonstrates its articulated concern. In their initial voir dire of this juror, that was not done, nor was it ever done. There is absolutely nothing in the record that connects this particular juror to the "fairly famous situation" that led to protests. Had such a record been made initially by the state, or by additional voir dire at step three of the traditional *Batson* analysis, it is conceivable that the record might demonstrate a legitimate race-neutral reason related to the case to be tried. In fact, had this juror been possessed of the animosity toward the state that the judge attributes to the protestors, a challenge for cause might very well have existed. But here, we have a record that is wholly insufficient to establish any such facts or inferences, coupled with a finding by the trial judge that has absolutely no support in the record.

{¶ 51} In *Purkett,* the United States Supreme Court concluded, "The Court of Appeals erred by combining *Batson*'s second and third step into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, i.e., a 'plausible' basis for believing that 'the person's ability to perform his or her duties as a juror' will be affected. 25 F.3d at 683. It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Batson,* [476 U.S.] at 98 [106 S.Ct. at 1723, 90 L.Ed.2d 69]; *Hernandez [v. New York* (1991), 500 U.S. 352] at 359[, 111 S.Ct. 1859, 114 L.Ed.2d 395] (plurality opinion). At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (Emphasis sic.) *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, 131 L.Ed.2d 834.

{¶ 52} This second- and third-step analysis may work neatly when the race-neutral explanation offered is one that hinges almost entirely on the credibility or genuine concerns of the prosecutor when they arise from the juror's responses, demeanor, or appearance. However, here we are dealing with a mere hunch, unsupported by Reynolds's statements, demeanor, or appearance. The fact that the juror's child was struck by an SUV at an unknown time, date, and location, along with all other attendant circumstances, does not constitute an even plausible basis for the finding that she couldn't possibly be fair to the state of Ohio. The

prosecutor's explanation, without more, relates to race, which is exactly what *Batson* seeks to avoid. Not only did the state fail in its burden of production, but the defense was denied an opportunity to meet its burden of persuasion. Defense counsel requested a limited voir dire of this juror when the challenge was made, to discern Reynolds's connection, if any, with the so-called infamous case and subsequent protests, but this request was arbitrarily and erroneously denied by the trial judge.

{¶ 53} In fact, as gatekeeper, the trial court was in the best position to learn this "knowable fact," i.e., the juror's connection, if any, to the protests and an unprosecuted case of some minority children. This gatekeeping function is particularly important when a determination must be made regarding a peremptory strike that appears racially motivated. As noted by several cases, "[I]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue * * *." *Hernandez v. New York* (1991), 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (plurality opinion). However, here we are dealing with facts that are knowable and discernable, with just a few questions put to the juror at sidebar by either defense counsel or the judge. Unlike the typical case in which there "will seldom be much evidence bearing on that issue," here the evidence was available to the court. Step three at a minimum required the court to make a finding supported by the record, one not based on mere conjecture; otherwise the Equal Protection Clause is purely illusory. It would have been very simple for the trial judge to properly assess the prosecutor's reasons because they could be objectively determined. Similarly, a couple of questions as requested by defense counsel at sidebar would have ferreted out the legitimate issue of pretext. The prosecutor resisted voir dire at sidebar, suggesting the "cat's out of the bag" and implying that it was too late for additional questions because he had chosen to exercise a challenge in front of the array. However, the state should not profit by its own ill-advised challenge of the solitary African American in front of the prospective panel. Otherwise, the state could insulate itself from any suggestion of pretext and constitutional scrutiny.

{¶ 54} Deference should not be given to rulings that lack factual support in the record. Neither should deference imply abandonment or abdication of judicial review. See *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029, 154 L.Ed.2d 931. On this record, public confidence in our system of justice and fundamental fairness is only undermined. *Batson* must be taken seriously, and peremptory strikes must be based on knowable facts not immunized from constitutional scrutiny.

{¶ 55} The first assignment of error is sustained.

{¶ 56} V. "Appellant was denied her right to a fair trial when the trial judge sent his bailiff into the jury deliberation room to instruct the jury, in response to a question, out of the hearing of appellant and her attorney."

{¶ 57} In her fifth assignment of error, Manns claims that her constitutional rights were violated when the trial court, through the bailiff, answered a jury question during deliberations without the presence of Manns and her attorney.

{¶ 58} During deliberations, the court had the following discussion with the attorneys regarding its response to a question by the jury.

{¶ 59} "THE COURT: For the record, the attorneys are present in chambers. The defendants are in the courtroom not present here.

{¶ 60} "There's a couple of things I wanted to put on the record.  * * *

{¶ 61} "[A]bout an hour ago as Dee was coming out from playing a tape, I believe one of the jurors informally asked, 'Can we find the defendant guilty of both murder and manslaughter or do we have to pick one or the other?'  I simply told her to have them refer to the section or sections that said multiple counts where it said you can find the defendants guilty of one—guilty or not guilty of one or all of the offenses.  So I just wanted—.

{¶ 62} "THE BAILIFF:  I didn't point that out.  All I said was that you referred them to review the multiple counts instruction.

{¶ 63} "THE COURT:  Okay. So I just wanted that to be clear on the record.

{¶ 64} "MS. CUSHMAN:  So they asked if they could find them guilty of both?

{¶ 65} "THE COURT:  I apologize.  No, no, it wasn't—I phrased it the wrong way.  It wasn't—I apologize.

{¶ 66} "MS. CUSHMAN:  Where can I throw up now?

{¶ 67} "MR. REED:  Anything else we can find them guilty of?

{¶ 68} "THE COURT:  No, it wasn't that at all.  I apologize.  The question was not suggestive at all.  It was—it was are these alternative charges, or do we have to pick one?  That's what it was.

{¶ 69} "MR. REED:  Let me ask you a question, Judge, because I've never had an indictment like this, to tell you the truth.  What happens if they find them guilty on all four?

{¶ 70} "MR. SCHUMAKER:  The manslaughter, we make an[ ] election, and basically the manslaughter and the theft is not brought to final judgment.  I mean, we would, obviously, elect if they're found guilty of all the [sic] four to proceed on the murder and agg robbery.

{¶ 71} "MR. REED: Judge, what are we going to do about sentencing?

{¶ 72} "THE COURT: I have no idea. I really don't. We can discuss that after the verdict. I'll be happy for you guys to approach, and we can discuss that; but my understanding is that they are—that the offenses merge and that the prosecutor would have to elect. I'm pretty sure.

{¶ 73} "MR. REED: That's what I thought."

{¶ 74} It is well established that a defendant in a criminal case has a right to be present when, pursuant to a request from the jury during its deliberations, the judge communicates with the jury regarding his instructions. *State v. Abrams* (1974), 39 Ohio St.2d 53, 68 O.O.2d 30, 313 N.E.2d 823. Consequently, any communication between the court and the jury outside the presence of the defendants is error and may be grounds for a new trial. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881; *Kirk v. State* (1846), 14 Ohio 511; *Jones v. State* (1875), 26 Ohio St. 208.

{¶ 75} The Supreme Court has made clear, however, that erroneous communications between the judge and jury constitute good cause for a new trial only if the communications prejudiced the defendant's right to a fair trial. *Abrams*, 39 Ohio St.2d at 56, 68 O.O.2d 30, 313 N.E.2d 823; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 233–237, 15 OBR 311, 473 N.E.2d 264. Where the communications are substantive, such as when the judge elaborates on an instruction or provides an additional instruction to the jury, courts have found that the error is prejudicial. See *State v. Alvarado* (Sept. 13, 2001), Cuyahoga App. No. 78629, 2001 WL 1075724. Conversely, where the judge merely restates previously given instructions, the communication between the judge and jury outside of the defendant's presence has been found to be harmless. See *Abrams*, 39 Ohio St.2d 53, 68 O.O.2d 30, 313 N.E.2d 823 (ex parte communication was harmless when the judge offered to reread his original instruction and the jurors declined the offer).

{¶ 76} In support of her assertion that the trial judge, in this case, committed prejudicial error when he sent his bailiff into the jury room to respond to a question, Manns relies upon *State v. Motley* (1985), 21 Ohio App.3d 240, 21 OBR 256, 486 N.E.2d 1259. In that case, the jury sent the judge a request that the testimony of a certain witness be reread to the jury. That request was denied. Fifteen minutes later, the jury sent the trial judge the following question: "Definition of knowingly on the matter. Receipt of stolen possession [sic] or possession of property." The word "difference" was written in an inverted position to the left of the other part of the question. The court reporter went into the jury room and read the definition of knowingly to the jury. Twenty minutes later, the jury returned a guilty verdict.

{¶ 77} On appeal, the Tenth District concluded that "it was highly prejudicial to defendant for the trial court to send the court reporter into the jury deliberation room, out of the presence of the defendant, defendant's counsel, and, apparently, the trial judge himself, for the purpose of responding to any question posed by the jury, much less the cryptic question posed by the jury in this case." While finding the communication by the court reporter, by itself, to be highly problematic, the court noted that the transcript was devoid of any indication as to what the judge had told the court reporter to tell the jury when she entered the room. In addition, the trial court's original instruction regarding "knowingly" had appeared in two different paragraphs, separated by a paragraph referring to the definition of "property," and the record did not indicate what portion or portions of the two paragraphs the court reporter felt were responsive to the jurors' question.

{¶ 78} In the instant case, we are troubled that the jurors' question was apparently conveyed to the court orally, resulting in the judge's imprecise reiteration of the question to counsel. The better course is to require the jury to articulate any and all questions in writing and to read the questions verbatim to the defendant and counsel prior to responding. Despite this obvious error in procedure, however, the bailiff's statement in chambers clearly reflects that she was asked by the court to refer the jury to the multiple-counts instruction and that, at the court's instruction, she merely informed the jurors that they should refer to that instruction. Based on the record, the communication did not supplement the instructions that the jury had been given by the judge, nor did it explain the previously given charge. Unlike in *Motley*, there is no question as to what instruction was at issue, and because the bailiff herein stated on the record what she had told the jurors, we need not guess what the bailiff said. In our view, the record in the instant case does not reveal that the communications between the trial court's bailiff and the jurors were prejudicial to Manns. Moreover, under these circumstances, the fact that the message was conveyed by the trial court's bailiff rather than the judge himself does not create any additional concerns. In summary, although the trial court clearly erred in communicating with the jurors through his bailiff and outside of the presence of the defendant and her counsel, that error was harmless beyond a reasonable doubt.

{¶ 79} The fifth assignment of error is overruled.

{¶ 80} IV. "Appellant was denied her right to a fair trial when the prosecutor, in closing argument, misstated critical law and facts."

{¶ 81} In her fourth assignment of error, Manns claims that during his closing argument, the prosecutor misstated the law and facts on the issue of her recklessness to her prejudice.

{¶ 82} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.

{¶ 83} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369; *State v. Stevens*, Montgomery App. No. 19572, 2003-Ohio-6249, 2003 WL 22764527, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *Stevens*, citing *Ballew* and *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.

{¶ 84} Manns claims that the prosecutor's comments during closing argument inappropriately "watered down" the legal standard for criminal recklessness and that he misstated the level of congestion in the mall parking lot at the time of the offense. Manns challenges the following portion of the state's closing argument:

{¶ 85} "You've got Amy; you've got Rachel; and you've got John [Deselem], if I can be permitted to call him that.

{¶ 86} "Out there in that area, and yet at the same time this car is speeding away, speeding through an *extremely congested area,* we have other people, as you find out, that are in the area. What is that? That's recklessness. That is recklessness, that they would speed off because, perhaps, a security officer is running on the sidewalk; and they decide that they're going to heedlessly disregard the known risk that these circumstances *can* occur and serious physical harm *can* occur." (Emphasis added.)

{¶ 87} We agree with Manns that the state exaggerated when it referred to the mall parking area as "extremely congested" and that the state misstated the

recklessness standard at that juncture. Upon reviewing the record as a whole, however, we do not find that Manns was prejudiced by these misstatements.

{¶ 88} On several occasions throughout the trial, the jurors were reminded that the court would instruct them on the law and that the arguments of counsel were merely intended to assist them. During his opening statement, counsel for Patterson asked the jury "to carefully listen to the law as it's instructed to you by His Honor and only His Honor. I cannot instruct you on the law." When the state began its closing argument, the prosecutor stated:

{¶ 89} "Counselors, Your Honor, ladies and gentlemen of the jury, we've thrown a lot at you for four days. Some of the most important parts of this trial are yet to come: When the Court gives you the instructions of law and when you walk in that door to your deliberations.

{¶ 90} "The Court will give you some instructions on how you should deliberate, how you work together without disturbing your individual conscience. The Court will define a number of terms for you.

{¶ 91} "And the State gladly accepts the burden of proof in this case; but I would implore you to listen, understand the instructions of law. You will have a written copy of them; and, please, if you don't understand anything about those instructions, review those instructions. And if you have any questions, please ask them so it can be clarified because all parties deserve that the jury follows the law of the State of Ohio in deciding this case."

{¶ 92} In the state's rebuttal closing argument, the prosecutor reiterated that the culpable mental state for inflicting serious physical harm is recklessness, and he properly defined that term for the jury at that time.

{¶ 93} Finally, at the conclusion of the closing arguments, the court instructed the jury on the elements for felony murder and aggravated robbery. These instructions indicated that it was required to find that the defendants recklessly inflicted serious physical harm upon Deselem. The court defined "recklessly" in accordance with R.C. 2901.22(C). We presume that the jury followed the court's instructions, particularly in light of the repeated admonishments by the court and counsel that the jurors should follow the law as given by the court. In sum, the record reflects that the state's single misstatement of the recklessness standard was harmless.

{¶ 94} As for the prosecutor's representation that the mall parking lot was "extremely congested," the court also instructed the jury prior to closing arguments that closing arguments are not evidence and that they are merely "summaries of what the attorneys believe the evidence has shown and how the law that applies to this case should be applied to the facts of the case." The court

repeated in its jury instructions that evidence does not include the indictment, opening arguments, or closing arguments.

{¶ 95} In addition, defense counsel responded to the state's argument that the parking lot was congested. McAlmont's counsel stated in her closing argument:

{¶ 96} "Mr. Schumaker stated in the opening that the evidence will show that this occurred in that congested pedestrian area. Did he give you evidence of that? No. As a matter of fact, all the witnesses were the State's witnesses; and they all said * * * I didn't see anybody else there. * * * You remember all that testimony. Nobody said it was congested, and we asked them. Nobody said it was congested area at all."

{¶ 97} Manns' attorney also addressed the prosecutor's statement that the area was heavily congested in his closing argument:

{¶ 98} "Mr. Schumaker talks about this heavily congested area; and yet all we know is it passed behind Amy and Rachel Cunningham, as Amy said, didn't think they were trying to hit anybody, didn't strike anybody else. And the best we can do in this really, really congested area is bring the deputy's wife, Ms. Douglas, Mr. Clarkson, Amy and Rachel, and Miss Lockwood.

{¶ 99} "And Ms. Lockwood's [in] that car. Mr. Clarkson's on the sidewalk and has just run out of the building so that leaves three or four people in this heavily congested area. (Indicating.)"

{¶ 100} In light of the court's instructions that the closing arguments are not evidence and the fact that defense counsel countered the state's representation that the parking lot was extremely congested during their own closing arguments, the state's misstatement was harmless beyond a reasonable doubt.

{¶ 101} The fourth assignment of error is overruled.

{¶ 102} In light of our ruling with respect to Manns's first assignment of error, the judgment of the trial court is reversed, and the matter is remanded for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

GRADY, P.J., concurs.

WOLFF, J., dissents.

WOLFF, J., dissenting.

{¶ 103} I respectfully dissent.

{¶ 104} As stated by the majority, the Supreme Court has set forth a three-step inquiry when the state's peremptory challenge has been challenged under

*Batson.* First, the defendant must set forth a prima facie case of discrimination. Next, the prosecutor must state a race-neutral explanation for striking the juror in question. "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins* (2006), 546 U.S. 333, 126 S.Ct. 969, 973–974, 163 L.Ed.2d 824, quoting *Purkett v. Elem,* 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834. The prosecutor need not establish that the juror could be stricken for cause. *Batson,* 476 U.S. at 99, 106 S.Ct. 1712, 90 L.Ed.2d 69. Third, the court must determine whether the defendant met his burden of proving intentional discrimination. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, 131 L.Ed.2d 834.

{¶ 105} In resolving the third prong, the Supreme Court has made clear that the ultimate issue is whether the trial court believed that the prosecutor exercised the peremptory challenge for a nondiscriminatory reason. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller–El v. Cockrell* (2003), 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931. As the court noted in *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395: "There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Id. at 365, 111 S.Ct. 1859, 114 L.Ed.2d 395, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 106} In reviewing whether the prosecutor's explanation is worthy of belief, courts have often looked to the behavior of the prosecutor prior to the exercise of the challenge. Contrast *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140 (state fought to keep one black juror but sought to excuse another who opposed the death penalty), with *Miller–El v. Dretke* (2005), 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (discriminatory intent demonstrated by the use of peremptory challenges to strike 91 percent of eligible black jurors, by the state's failure to strike comparable white jurors, the shuffling of the venire panel, using different questioning for black jurors, and evidence of a general policy to exclude black venire members).

{¶ 107} Moreover, the Supreme Court has not required a trial court to find intentional discrimination when the prosecutor's suspicions are not substantiated by the record. In *Collins,* a habeas case, the prosecutor asserted as one of her reasons for striking Juror 16 that she believed that the juror, as a young and single citizen with no ties to the community, might be too tolerant of the crime with which the defendant was charged. On appeal, the court of appeals had stated that the prosecutor's proffered reason was unsupportable because Juror 16 had replied affirmatively when asked whether she believed that the crime with which respondent was charged should be illegal and disclaimed any other reason that she could not be impartial. The Supreme Court reversed the court of appeals, stating:

{¶ 108} "That the prosecutor claimed to hold such concerns despite Juror 16's *voir dire* averments does not establish that she offered a pretext. It is not unreasonable to believe the prosecutor remained worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of a controlled substance. * * * Even if the prosecutor was overly cautious in this regard, her wariness of the young and the rootless could be seen as race neutral, for she used a peremptory strike on a white male juror, Juror 6, with the same characteristics." "Viewing the [appellate] panel majority's concerns together, the most generous reading would suggest only that the trial court had reason to question the prosecutor's credibility regarding Juror 16's alleged improper demeanor. That does not, however, compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude [the defendant] had shown a *Batson* violation. Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Collins,* 546 U.S. 333, 126 S.Ct. at 975, 163 L.Ed.2d 824.

{¶ 109} In the case before us, the ultimate issue was whether the state's attempt to peremptorily challenge Reynolds was race-based. The state's peremptory challenge was based upon a suspicion that Reynolds would be hostile to the state because she might have been among a group of African–Americans who protested the prosecutor's failure to prosecute someone who had struck four children with an SUV. Reynolds had stated during voir dire that her child had been struck by an SUV. The prosecutor stated: "I think this [referring to Reynolds] is one of the families * * * but I * * * can't remember."

{¶ 110} In my view, the concern expressed by the state in the instant case was not that Reynolds could not fairly consider its case against four African–American defendants because she also is African–American. Rather, the prosecutor articulated a racially neutral selection criterion related to the juror's view

concerning the outcome of the case to be tried when he offered his belief that, based on the juror's earlier response that her daughter had been the victim of a crime when she was "run over by an SUV," the juror might have an animus against the state for not prosecuting the person who was responsible, which many people in the community apparently did. The reason was sufficiently particular to this juror to avoid the general discriminatory racial attitudes that *Batson* condemns. The possibility that Reynolds was one of the protestors was enough to make out a race-neutral explanation for the exercise of the peremptory challenge, thus satisfying the second prong in *Batson*.

{¶ 111} It was the defendant's burden, however, to prove that purposeful racial discrimination was behind the peremptory challenge of Reynolds. See *Purkett,* supra. Considering this burden, I agree with the majority that the trial court failed to adequately perform its gatekeeping duties. In light of the fact that the four codefendants were African–American and the jury pool was predominantly Caucasian, the trial court ideally should have cautioned the attorneys to discuss in a sidebar the potential use of a peremptory challenge against an African–American potential juror prior to such a challenge. If this had been done, the court could have easily had Reynolds questioned further about her possible participation in the protests without her being aware of which party—the state or one of the defendants—desired more information. The state then could have determined whether its concerns were allayed prior to any public request to excuse Reynolds. Suffice it to say, this is not what happened.

{¶ 112} Although complicated somewhat by the public nature of the state's peremptory challenge, it would have been a simple matter to reopen questioning of Reynolds, as requested by the defense after the state's use of the peremptory challenge, to determine whether Reynolds had been among the protestors. I agree with the majority that the trial court erred in sustaining the prosecutor's objection to that request and in apparently finding from its own recollection that Reynolds was, in fact, one of the protestors.

{¶ 113} I disagree with the majority, however, that the defendant established purposeful race discrimination due to the prosecutor's lack of certainty and supporting evidence that Reynolds was one of the protestors. The trial court, which was familiar with the protests, found the prosecutor's reason to be credible and sincere. In other words, the court concluded that the prosecutor had a genuine nondiscriminatory motive. In my judgment, the trial court properly relied upon its recollection of the circumstances of the protests in determining whether the state's proffered reason for exercising the peremptory challenge was sincere. In finding the *Batson* challenge to be without merit, the trial court satisfied its obligation under the third *Batson* prong to determine whether the prosecutor had exercised the peremptory challenge for a discriminatory reason.

{¶ 114} In determining whether the trial court committed *reversible* error by not permitting further questioning of Reynolds, the question is whether the defendants would have likely proven purposeful racial discrimination if further questioning of Reynolds—had it taken place—revealed that Reynolds had not been one of the protestors. In my judgment, that information would not have proven purposeful racial discrimination but only that the prosecutor's suspicion that Reynolds would be a hostile juror was unfounded. The same might be said for the concerns of the prosecutors in *Purkett* and *Collins*. Although the prosecutors in those cases ostensibly challenged the prospective jurors based on readily apparent characteristics (hair length, age, and lack of ties to the community), the prosecutors' belief that these prospective jurors would be hostile to its case, based on those characteristics, was hardly less speculative than in the situation now before us. In other words, the mere fact that Reynolds was not one of the protestors would not have demonstrated that the peremptory challenge was a pretext for purposeful racial discrimination. *Collins*, supra.

{¶ 115} The trial court's conclusion that the prosecutor exercised the peremptory challenge for a nondiscriminatory reason—given the information known at that time—was sufficient to withstand the *Batson* challenge. The trial court's determination of the prosecutor's credibility is entitled to substantial deference.

{¶ 116} I would find the trial court's error harmless, overrule the first assignment of error, and affirm the judgment.