OPINION
{¶ 1} Defendant-appellant Tracy D. Hunter appeals his conviction and sentence for one count of aggravated burglary, in violation of R.C. § 2911.11(A)(2), a felony of the first degree, with an accompanying firearm specification.
 {¶ 2} Hunter was indicted on December 15, 2006, for one count of aggravated burglary *Page 2 
with a firearm specification. Hunter was arraigned on December 19, 2006, stood mute, and the trial court entered a not guilty plea on his behalf. The case proceeded to trial in the latter part of February, 2007. On February 27, 2007, however, the trial court declared a mistrial after it became apparent that the jury was unable to reach a unanimous verdict.
 {¶ 3} A second jury trial commenced on April 2, 2007, and Hunter was subsequently found guilty of aggravated burglary with an accompanying firearm specification. On May 2, 2007, the trial court sentenced Hunter to an aggregate prison term of eleven (11) years. Hunter filed a timely notice of appeal with this Court on June 1, 2007.
 I {¶ 4} At approximately 11:00 p.m. on November 20, 2006, Gary Hand and Tiffany Henderson were at Hand's residence admittedly smoking crack on a sofa in his living room. After hearing someone knock on his door, Hand got up to go see who it was. He observed an individual standing outside his door dressed in a hooded sweatshirt with his or her face obscured. Believing the individual to neighbor from the street where he lived, Hand decided not to answer the door. As Hand returned to the sofa, the door flew open, and Hunter entered Hand's residence armed with a handgun. Hand and Hunter were past acquaintances, and Hand was aware that Hunter and Henderson had a child together.
 {¶ 5} At this point, Henderson shouted "Stop, Tracy!" and "Somebody help!" Hand fled from his house and ran to a neighbor's house to call 911. Hand observed Hunter and Henderson leave his house, and Hunter was carrying Hand's coat.
 {¶ 6} Upon arriving at the scene, the police took a statement from Hand in which he described both Henderson and Hunter. The police went to the home of Hunter's mother searching for Hunter, but were unable to locate him. The police proceeded to a second address in order to *Page 3 
continue the search for Hunter, but were again unable to find him. However, as the police were leaving the second address, they observed Hunter and Henderson drive by the house. Hunter was stopped and taken into custody by the police shortly thereafter. The police searched the vehicle that Hunter was driving and found Hand's coat, but no handgun was recovered.
 {¶ 7} As previously stated, Hunter was indicted for one count of aggravated burglary with an accompanying firearm specification. Hunter's first trial ended in a mistrial. At the close of his second trial, however, Hunter was found guilty of the charged offense and sentenced to eleven (11) years imprisonment.
 {¶ 8} It is from this judgment that Hunter now appeals.
 II {¶ 9} Hunter's sole assignment of error is as follows:
 {¶ 10} "THE TRIAL COURT ERRED IN PERMITTING THE STATE TO USE A PREEMPTORY [sic] CHALLENGE IN A RACIALLY DISCRIMINATORY FASHION THEREBY DENYING APPELLANT EQUAL PROTECTION UNDER THE LAW AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."
 {¶ 11} In his sole assignment, Hunter contends that the trial court erred by permitting the State to use its peremptory challenges to dismiss the only two African-American jurors from the venire in violation of Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712. The trial court allowed peremptory challenges to be made in chambers. After both parties had passed on any further peremptory strikes in chambers and the trial court had read the names of the jurors who were to be seated, defense counsel objected pursuant to Batson that the State had excused the only two African-American jurors on the panel. The State offered its reasons for the excusal of both jurors, and the trial court overruled the Batson challenge. The trial then proceeded with an all *Page 4 
Caucasian jury.
 {¶ 12} Initially, it should be noted that a Batson challenge must be made in a timely manner. We have previously held that a Batson challenge is timely if it is made before the jury is sworn, with the better practice being that the objection be made contemporaneous with the peremptory challenge. State v. Brooks (June 4, 1987), Montgomery App. No. 9190; State v. Robertson (1993), 90 Ohio App.3d 715, 630 N.E.2d 422. Waiting to proffer an objection on Batson grounds until after the jury is sworn prevents the trial court from noticing and correcting that error. In the instant matter, the record establishes that defense counsel raised a Batson challenge in the trial judge's chambers before the jury had been sworn or any members of the jury had been released. Thus, we hold that the Batson challenge was made in timely fashion, and that no prejudice resulted from defense counsel's failure to raise the objection immediately following the State's peremptory challenge.
 {¶ 13} The state's use of peremptory challenges in order to exclude potential jury members based solely on their race is prohibited under the Equal Protection Clause of the Fourteenth Amendment. Batson v.Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1859. In Batson, the Supreme Court set forth a three step test for determining whether a prosecutor's use of a peremptory challenge is racially motivated.
 {¶ 14} First, the opponent of the peremptory challenge must set forth a prima facie case of racial discrimination. Id. at 82. The opponent must point to facts and other circumstances which are sufficient to raise an inference that the prosecution used its peremptory challenge in a racially motivated way. Id. In this case, however, the court made no ruling on whether the Defendant made a prima facie showing of discrimination. Rather, the prosecutor went on to offer race-neutral explanations for both of the excused African-American jurors and the judge overruled the *Page 5 
 Batson challenge based on those explanations. The Supreme Court has noted that "once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."Hernandez v. New York (1991), 500 U.S. 352, 359, 111 S.Ct. 1859.
 {¶ 15} The burden then shifts to the prosecution to offer a race neutral reason for the challenge. At this stage the explanation must be more than an affirmation of good faith, but need not rise to the level of a challenge for cause. State v. Manns, 169 Ohio App.3d 687,2006-Ohio-5802, citing Purkett v. Elem (1995), 514 U.S. 765, 768,115 S.Ct. 1769. Unless a discriminatory intent is inherent, the explanation will be deemed race neutral. Hernandez, 500 U.S. at 360.
 {¶ 16} Finally, the trial court must determine whether the race-neutral reason advanced by the prosecution is merely a pretext for purposeful racial discrimination. Since this stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference. State v. Manns, 169 Ohio App.3d 687, 2006-Ohio-5802,citing Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95,102, 676 N.E.2d 872; Hernandez, 500 U.S. at 365; Miller-El v.Dretke (2005), 545 U.S. 231, 125 S.Ct. 2317.
 {¶ 17} In making this determination, the U.S. Supreme Court has set forth several factors to consider: 1) the bare statistics; 2) the similarity of answers to voir dire questions between the African-American prospective jurors who were struck and the answers of the non-African-American who served; 3) broader patterns of practice, including jury shuffling; 4) disparate questioning of African-American jurors; and 5) evidence that the prosecutor's office has *Page 6 
historically discriminated against African-Americans in jury selection. Miller-El, 545 U.S. 231, 125 S.Ct. 2317.
 {¶ 18} In the instant case, there is no allegation that the prosecutor's office has historically discriminated against African-American jurors, no allegation or indication that the prosecutor in this case questioned African-American jurors differently, nor any evidence of broader patterns of practice, such as jury shuffling.
 {¶ 19} Further, there is also no evidence that the "bare statistics" support a Batson challenge. While no African-American jurors served on the jury, there were only two prospective jurors who were African-American. The lack of African-American jurors could very well be the result of so few African-American jurors being randomly selected for the jury pool. See e.g. State v. Frazier, 115 Ohio St.3d 139,873 N.E.2d 1263, 2007-Ohio-5048, (holding that lack of African-Americans on chosen jury did not satisfy the "bare statistics" factor since jury pool only included six African-Americans out of 86 prospective jurors in the original jury pool for Frazier's trial, and only three African-Americans out of a final jury pool of 44 prospective jurors).
 {¶ 20} The remaining factor looks at the similarity of the answers between African-American jurors struck from the panel and the answers of Caucasian jurors who served on the jury. In Miller-El, the Supreme Court held the following:
 {¶ 21} "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."545 U.S. at 241.
 {¶ 22} In Miller-El, the Supreme Court compared the responses of African-American panelists stricken from the jury with those of their Caucasian counterparts who served on the jury in light of the prosecution's purported race neutral reasons for striking the African-American *Page 7 
jurors. The Supreme Court found that the responses were strongly similar, with some insignificant differences. Notably, the Court found that the prosecution struck an African-American juror based on his views regarding the death penalty, but did not strike Caucasian jurors who expressed the same opinion, despite having ample peremptory challenges to do so. The Court went on the state that "the fact that [the prosecutor's] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." Id. at 248.See also State v. Belcher (1993), 89 Ohio App.3d 24, 623 N.E.2d 583
(holding that disparate treatment of African-American jurors giving similar answers to Caucasian jurors weighs heavily against any race-neutral explanation).
 {¶ 23} The state used its second peremptory challenge to strike the first African-American juror, Regina Swanson. When prompted for its reasoning following the Batson challenge, the prosecutor stated the follwing:
 {¶ 24} "* * * And that was for a reason that was not based on race. It was based on her past. She had been in contact with those convicted of crimes, those victims of crimes. She had a real problem because she had been an alternate juror. So much so that she had to come back here and talk to us and then her only reason was well, I just didn't like it. . ." (T. 105-106).
 {¶ 25} Ms. Swanson testified during voir dire that her brother had been robbed and shot, leaving him paralyzed. When asked about this, she indicated some doubt about the justice system:
 {¶ 26} "Q: . . .If there anything about going through that experience that affects your perception of police one way or another?
 {¶ 27} "A: Kind of.
 {¶ 28} "Q: How? Can you talk about that? *Page 8 
 {¶ 29} "A: I just think that sometimes the system doesn't work."
 {¶ 30} (T.46).
 {¶ 31} However, Ms. Swanson did go on to state that she could be fair and impartial and could obey instructions given to her by the judge.
 {¶ 32} More importantly, when asked about her prior jury service, Ms. Swanson replied that she had previously been an alternate and that it had not been a good experience. She did not wish to discuss it in the presence of the other jurors and was later interviewed in chambers. When the trial judge asked her about her experience she replied:
 {¶ 33} "A: I was an alternate juror in a civil case and I felt that, well, just, I feel as an alternate that I shouldn't have been sitting on the-sitting up in the jury box listening to all the evidence."
 {¶ 34} She was then questioned by the prosecution about her experience as an alternate:
 {¶ 35} "Q: You think you should have been able to vote since you had to listen to the evidence?
 {¶ 36} "A: No. It wasn't that. I just felt I shouldn't have been sitting out there not having a part in, I guess, the final part."
 {¶ 37} (T. 61-62).
 {¶ 38} After prompting by the court, she did say she would serve as an alternate juror if chosen and that she did understand why alternate jurors were chosen.
 {¶ 39} Ms. Swanson was the only juror who indicated that they felt the system did not work as a result of her experience as an alternate juror. After a thorough review of Ms. Swanson's responses to the questions asked of her during voir dire, it is abundantly clear that the *Page 9 
State possessed a sufficient race-neutral basis upon which to excuse her and overcome a Batson challenge.
 {¶ 40} Ms. Jones took Ms. Swanson's seat after she was excused, and the State used its next peremptory challenge to dismiss Ms. Jones from the panel. When prompted for a race-neutral reason following theBatson challenge, the prosecution stated the following:
 {¶ 41} "During the questions about drugs she said that she would not give someone who-I don't know her specific word if it was use or addicted to drugs, the same credibility as someone else. That there was an affect on the mind of someone who has used drugs. Knowing the state's case, that is the basis for the excusal." (T. 106).
 {¶ 42} Defense counsel replied that other Caucasian members of the panel agreed with Ms. Jones' logic and were not excused. (T. 107). However, defense counsel also stated the following:
 {¶ 43} "First of all, that's a credibility issue. We're asking about factors that lead to
 {¶ 44} credibility. They're allowed to weigh credibility. Secondly, as pertains to the Batson challenge, Ms. Berry agreed with that logic. Mr. Bean agreed with that logic. Mr. Whitley agreed with [that] logic. Allalso, Mr. Whitley was struck. Ms. Berry was not struck. Mr. Bean was not struck.
 {¶ 45} The trial judge overruled the Batson challenge, stating:
 {¶ 46} "I am going to overrule the Batson motion. I think there is a reason for it. I think, furthermore, the questioning-you elicited the questioning. I mean, you did it. You brought it out. They didn't do it. I'm going to overrule. We've got our jury." (T. 107)
 {¶ 47} The line of questioning to which the prosecution referenced was elicited during the defense counsel in his voir dire: *Page 10 
 {¶ 48} "Q: * * * If it's on a level playing field and you have one person who has used some difficult drugs and you have people that don't had [sic] use of that drugs, do they get the same credibility?
 {¶ 49} "Let's try Ms. Jones?
 {¶ 50} "A: (Indiscernible)
 {¶ 51} "Q: Do you want me to call on somebody else?
 {¶ 52} "A: No, not really
 {¶ 53} "Q: It's like in school in third grade when you're just hoping, don't call on me, don't call on me.
 {¶ 54} "A: That's so hard. I'm going to say no.
 {¶ 55} "Q: Okay. And that's difficult to answer, isn't it?
 {¶ 56} "A: Un-huh-Affirmative.
 {¶ 57} "Q: I mean you want to do the, you know, true blue American, everybody is equal, but the fact it, when you look at it, you'd say no. Why would you say no?
 {¶ 58} "A: I think the person who uses drugs I think it would have an effect on their mind.
 {¶ 59} "Q: Okay? The kind of things we've just been talking about?
 {¶ 60} "A: Yeah.
 {¶ 61} "Q: Where they can rationalize actions, they can rationalize a lot of things to further what they want even if they don't see it?
 {¶ 62} "A: Right."
 {¶ 63} (T. 80-81).
 {¶ 64} When interviewed by defense counsel, David Whitley, a Caucasian male, gave *Page 11 
similar answers to those of Ms. Jones on the subject of the credibility of an individual who has used crack cocaine:
 {¶ 65} "Q: Mr. Whitley, what's your perception of crack cocaine?
 {¶ 66} "A: A street drug, highly addictive.
 {¶ 67} "Q: Do you think someone could use it recreationally?
 {¶ 68} "A: No. I've known people that have used it and I don't know anybody that uses it recreationally.
 {¶ 69} "Q: Okay. Do you think that if someone uses crack cocaine they are necessarily an addict?
 {¶ 70} "A: I don't know about addict. I don't know anybody that's ever used crack that their life has ever gotten better.
 {¶ 71} "Q: That's a true statement. Okay. Why do you say you don't know about an addict?
 {¶ 72} "A: Addiction is something — I know that the drug is highly addictive. I don't know that after one use you're necessarily addicted.
 {¶ 73} "Q: Okay."
 {¶ 74} Of the panelists who expressed an opinion on the effect of drug use, Ms. Jones and Mr. Whitley were excused from the panel. Because the State used two of its peremptory challenges to excuse both an African-American and a Caucasian for providing the similar answers regarding the credibility of individuals who use drugs, Hunter cannot now claim that the reason for Ms. Jones' excusal was pre-textual based on her race. Although the State chose not to excuse every Caucasian panelist who gave similar answers to her, the State did dismiss Mr. Whitley, a *Page 12 
Caucasian, who, by defense counsel's own admission, gave similar answers to those provided by Ms. Jones. Thus, the State's explanation for striking Ms. Jones passes the race-neutral analysis because a similarly situated Caucasian juror was also stricken, andBatson was not violated in this instance.
 {¶ 75} Hunter's sole assignment of error is overruled.
 III {¶ 76} Hunter's sole assignment of error having been overruled, the judgment of the trial court is affirmed.
WOLFF, P.J. and BROGAN, J., concur.
Copies mailed to:
Carley J. Ingram
Christopher W. Thompson
 Hon. Barbara Gorman *Page 1