OPINION
{¶ 1} Defendant-appellant, Kevin David Cobb, Jr., appeals his convictions in the Butler County Court of Common Pleas of 16 counts including felonious assault, retaliation, abduction, and multiple drug possession and trafficking offenses. Cobb also appeals his classification as a sexual predator after his conviction for unlawful sexual conduct with a minor. We affirm the decision of the trial court as to the convictions but remand on two sentencing issues. *Page 2 
 I. Statement of Facts {¶ 2} Beginning in April 2005, Cobb, then 18 years old, [1] began a relationship with M.B. who was 15 years old. The two met at the apartment complex in which they resided, and eventually Cobb and M.B. engaged in sexual relations. Although M.B.'s mother disapproved of the relationship, M.B. continued to maintain her association with Cobb, often spending the night at his home.
 {¶ 3} When asked to describe the manner of their relationship, Cobb, in a written statement to the West Chester Police Department, responded that they were friends who had sexual relations including "oral and regular sex." Cobb also stated that he and M.B. had engaged in sexually-orientated role-playing between five and 12 times. Specifically, Cobb described a role-playing incident in which the two concocted a scene that began with M.B. finding another woman's number in Cobb's cell-phone and ended in pushing each other, as well as Cobb grabbing M.B.'s hair and holding her arms behind her while they had intercourse. Cobb told the officer that this particular role-playing incident took place around June 10, 2006. When asked if Cobb had ever assaulted M.B., he denied ever having been violent with her outside the role-playing incidents.
 {¶ 4} On June 14, 2006, M.B. and her mother went to the West Chester Police Station and filed a sexual assault report in which M.B. stated that she had a sexual relationship with Cobb that began when she was 15 (in 2005) that lasted until approximately two days before she filed the police report. M.B. also stated that on June 9, 2006, she and Cobb argued and he physically assaulted her by striking her in the head with a handgun. At no time, however, did M.B. claim that the injuries she suffered were the result of any sexually-orientated role-playing. *Page 3 
 {¶ 5} Specifically, M.B. told the police that she had gone to Cobb's apartment because the two planned on seeing a movie later that night. However, upon her arrival, Cobb left M.B. in his apartment and went to pick up his friends. When Cobb returned to his apartment, he directed M.B. to go to his bedroom and stay there while he conversed with his friends. When M.B. refused, Cobb closed the door, hit M.B., and pushed her against the wall. Cobb then went to his closet to get a gun and proceeded to hit M.B. on the side of the head with it, at which point, the clip fell out. Cobb told M.B. that had the clip not fallen out, he would have shot her and that her mother would not have been able to find her body. After Cobb hit M.B. with the gun, his friends came into his room and took M.B. home. After returning home with bruises on her face, M.B. told her mother that she had been in a fight at school.
 {¶ 6} A few days after the incident, M.B. agreed to meet Cobb and the two went to dinner and back to his apartment. Another fight ensued when M.B. refused to retrieve a digital scale and accompany Cobb on a drug deal. She testified that Cobb told her that she was coming with him to avert suspicion because having a female in the car would make the transaction "look better." After she refused, the two argued but ultimately, M.B. spent the night at Cobb's apartment.
 {¶ 7} During this time, M.B.'s mother filed a missing person's report and directed the police to question Cobb regarding M.B.'s whereabouts. When the police came to Cobb's residence the next morning, Cobb told M.B. to sit on the opposite side of his bed, away from the door, to stay there, and not to move. If she did not obey, Cobb threatened to hurt her and her family and stated that he would have a shootout with the police if she caused any trouble. When the police asked Cobb if they could come in to discuss M.B.'s disappearance, Cobb refused to let them in because they did not have a warrant. After leaving Cobb's doorstep, however, the police sat at the bottom of his street so that they could see if anyone *Page 4 
entered or exited Cobb's home. Cobb was able to see the police through his bedroom window and told M.B. to exit through his back door and to call her mother and offer her a cover story to explain why she had not been home.
 {¶ 8} Once M.B. left Cobb's home, she told her mother the cover story but soon thereafter, explained that she had been with Cobb and the events that had transpired over the previous few days. At that point, M.B. and her mother went to the police station, where she gave her statement and met with Andrew Schweier, a detective with the West Chester Police Department, Criminal Investigation Section, Youth Aid Unit.
 {¶ 9} After Detective Schweier became involved in the investigation, including taking Cobb's written statement referenced above, a magistrate approved a search warrant so that the police could search Cobb's apartment for the gun he allegedly used to assault M.B. During the search, the police viewed incriminating evidence which indicated Cobb's involvement in drug-related activity. At that point, the officers stopped their search and procured a second search warrant allowing them to search for and seize drug-related paraphernalia and other contraband. Subsequent to the search and seizure of multiple guns, narcotics, drug-related paraphernalia, and large amounts of cash, charges were filed against Cobb.[2] Fearing that Cobb would retaliate or try to stop her daughter from testifying, M.B.'s mother sent her to live with relatives in California for the summer. When M.B. was unable to testify, the charges against Cobb were temporarily dropped.
 {¶ 10} However, approximately two and a half months later, a man was arrested for drug possession and later identified Cobb as his drug supplier. In an attempt to gather evidence and build a case against Cobb, the West Chester police began an undercover *Page 5 
operation and ultimately involved the Ohio Bureau of Criminal Identification and Investigation ("BCI"). Specifically, the informant introduced an undercover agent to Cobb and during the course of the operation, Cobb sold the agent crack cocaine, power cocaine, and heroin on multiple occasions.
 {¶ 11} During the ongoing investigation, M.B. returned to Ohio in order to start the school year, at which time Cobb began to threaten her. In a recorded phone call, Cobb told M.B. that he was "unstoppable" and reminded her that the previous charges were dropped and that he could beat any charges that she or her mother levied against him. Also during the phone call, Cobb told M.B. that he knew where she and her family lived, worked, and attended church and then told her that "somebody gonna get their ass f***ed up . . . Believe that. You all gonna be crying at the end of the day." Shortly thereafter, while M.B. waited at a bus stop, a man assaulted her and then fled in a car in which Cobb was a passenger. The next day, M.B.'s home was also broken into and damage was done to the house and the family's personal property. Although the police and BCI had hoped to continue their investigation in order to learn how extensive Cobb's drug business was or possibly the identity of his supplier, they decided to arrest Cobb due to concerns over M.B.'s safety. BCI's undercover agent arranged a final sale with Cobb to take place at a local fast food restaurant. Before the actual transaction occurred, the police arrested Cobb and found a baggie of cocaine in the back seat of the vehicle in which Cobb was a passenger.
 {¶ 12} In October 2006, Cobb was indicted on single counts of felonious assault, unlawful sexual conduct with a minor, retaliation, possession of heroin, aggravated trafficking in drugs, engaging in a pattern of corrupt activity, and abduction, as well as two counts of possession of cocaine, three counts of trafficking in heroin, and four counts of trafficking in cocaine.
 {¶ 13} Soon thereafter, Cobb moved to sever the charges in his indictment, and to *Page 6 
suppress evidence, claiming that the warrant which authorized the initial search of his home was not issued upon probable cause. Shortly thereafter, Cobb's counsel became ill and the court approved a substitution who represented Cobb at the January 19, 2007 hearing on his motion to sever. The court denied the motion to sever but did not consider the motion to suppress, as Cobb's new counsel requested additional time to familiarize himself with the case and to review the warrants and accompanying affidavits. After the filing of an amended motion to suppress, the court heard the matter on April 17, 2007 and denied Cobb's motion, finding that the warrant was based on probable cause and that Cobb waived his Miranda rights before giving the police his written and verbal statements. After a three-day trial in April 2007, a jury found Cobb guilty on each of the 16 counts and the court sentenced him to an aggregate prison sentence of 29 years. It is from the court's decision to deny the motions to suppress and to sever, and from the convictions that Cobb now timely appeals, raising eight assignments of error.
 II. Effective Assistance of Counsel {¶ 14} In the majority of his assignments of error, Cobb argues that he received ineffective assistance of counsel. Therefore, we address each argument cognizant of the Sixth Amendment which pronounces an accused's right to effective assistance of counsel. Warning against the temptation to view counsel's actions in hindsight, the Supreme Court stated that judicial scrutiny of an ineffective assistance claim must be "highly deferential * * *. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions `might be considered sound trial strategy.'" Strickland v. Washington (1984), 466 U.S. 668,689, 104 S.Ct. 2052, quoting Michel v. Louisiana (1955), 350 U.S. 91,101, 76 S.Ct. 158. *Page 7 
 {¶ 15} Also within Strickland, the Supreme Court established a two-part test which requires an appellant to establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." State v. Myers, Fayette App. No. CA2005-12-035, 2007-Ohio-915, ¶ 33, citing Strickland.
 {¶ 16} Regarding the first prong, an appellant must show that his counsel's representation "fell below an objective standard of reasonableness." Strickland at 688. The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. Because the appellant must prove both prongs, a reviewing court need not address the deficiency issue if appellant was not sufficiently prejudiced by counsel's performance. Id. at 697. We therefore address Cobb's assignments of error, mindful of these principles.
 III. Motions to Suppress {¶ 17} Assignment of Error No. 1:
 {¶ 18} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS EVIDENCE GAINED AGAINST APPELLANT THROUGH ILLEGAL SEARCHES, AND COUNSEL PROVIDED INEFFECTIVE ASSITANCE IN FAILING TO INVESTIGATE AND FULLY INFORM THE COURT OF SUFFICIENT FACTS CONCERNING SUPPRESSION ISSUES."
 {¶ 19} In his first assignment of error, Cobb argues that the initial search warrant authorizing the police to search and seize the gun he allegedly used to assault M.B. was not supported by probable cause so that any resulting seizure and subsequent statements should have been suppressed. This argument lacks merit.
 {¶ 20} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. State v. Cochran, Preble App. No. CA2006-10-023, 2007-Ohio-3353. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and *Page 8 
evaluate witness credibility. Id. Therefore, on appeal, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Oatis, Butler App. No. CA2005-03-074, 2005-Ohio-6038. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." Cochran at ¶ 12.
 A. Search Warrants {¶ 21} The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
 {¶ 22} While the Fourth Amendment does not contain an express mandate that evidence seized as a result of an illegal search must be suppressed, the exclusionary rule is inherent in the amendment's protectionary language. "The rule thus operates as `a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" United States v. Leon (1984), 468 U.S. 897, 906,104 S.Ct. 3405, citing United States v. Clandra (1974), 414 U.S. 338, 348,94 S.Ct. 613. Further, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Leon at 916.
 {¶ 23} However, the exclusionary rule need not be employed when police properly execute a legal warrant issued by a detached magistrate which is supported by probable cause. State v. George (1989),45 Ohio St.3d 325. Because "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules," when determining whether the *Page 9 
supporting affidavit provides sufficient probable cause, the issuing magistrate need only make a practical, commonsense decision using a totality of the circumstances approach. Illinois v. Gates (1983),462 U.S. 213, 232, 103 S.Ct. 2317; State v. Akers, Butler App. No. CA2007-07-163, 2008-Ohio-4164. According to Crim. R. 41(C), "the finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished."[3] "The standard for probable cause does not require a prima facie showing of criminal activity; rather, it only requires a showing that a probability of criminal activity exists."State v. Young, Clermont App. No. CA2005-08-074, 2006-Ohio-1784, ¶ 19.
 {¶ 24} When reviewing the magistrate's decision to issue a warrant, neither a trial court nor an appellate court will conduct a de novo determination as to whether the affidavit provided sufficient probable cause. Akers. Instead, the reviewing court need only ensure that the magistrate had a substantial basis for concluding that the probable cause existed. Id. When making its determination, an appellate court is confined to the information contained in the four corners of the affidavit filed in support of the warrant. State v. Landis, Butler App. No. CA2005-10-428, 2006-Ohio-3538.
 1. First Warrant {¶ 25} The first search warrant in question was supported by the affidavit of Detective Schweier who originally took M.B.'s statement regarding the assault. In his affidavit, Detective Schweier outlined the assault and abduction and provided the magistrate with details such as M.B.'s mother filing a missing person's report on her daughter, the type of gun *Page 10 
used during the crime, and that when Cobb hit M.B. with it, the clip fell out. The affidavit also contained the fact that M.B. had a small laceration of her face near her mouth as a result of the assault.
 {¶ 26} While Cobb argues that the court erred by relying on unsubstantiated hearsay statements of "an unknown informant," the record clearly indicates that Detective Schweier relied on M.B.'s firsthand account of the events and on his own perception of her injuries. SeeIllinois v. Gates, 462 U.S. at 234 (noting that an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand," entitles the statement to greater weight than one based solely on unsubstantiated hearsay).
 {¶ 27} Cobb also argues that M.B.'s statements to Detective Schweier could not have provided the credible and competent information necessary to substantiate probable cause. However, at the hearing, the trial court reviewed the warrant and supporting affidavit and noted that Detective Schweier "had information that the child had previously been reported missing by her mother. Then the child returned later that afternoon. * * * [M.B.] provided that officer with information indicating that she was assaulted by either a deadly weapon or a 38 caliber pistol. It's also important to point out that the officers had physical evidence that she was assaulted, specifically there's information in the search warrant itself that the * * * victim had injuries near her mouth on her face." Based on these facts, the trial court found that M. B.'s information was credible and competent so that the magistrate had a substantial basis for concluding that probable cause existed. We find no error in this conclusion.
 2. Second Warrant {¶ 28} Cobb also argues that the second warrant was a fruit of the first illegal warrant and that the evidence seized as a result should also have been suppressed. This argument lacks merit.
 {¶ 29} As already determined, the first warrant was legal and although it limited the *Page 11 
initial search to firearms, [4] the drug paraphernalia and other contraband were in plain view upon execution.
 {¶ 30} "The plain view doctrine allows police officers, under particular circumstances, to seize an `article of incriminating character' which is not described in their search warrant. The doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owners' privacy interest in that item is lost." State v. Halczyszak (1986), 25 Ohio St.3d 301, 303, citing Illinois v. Andreas (1983), 463 U.S. 765, 771, 103 S.Ct. 3319. The Ohio Supreme Court set out a three-part test in order to determine if an object is in plain view. Halczyszak. The police need to be in a position to view the object legitimately, the object's discovery must be inadvertent, and the object's incriminating nature must be immediately apparent. Id.
 {¶ 31} As already determined, the first warrant conformed to constitutional precepts and provided a legal basis for the officers' presence in Cobb's home. Once there, the officers executed the warrant and while searching for the gun used in the assault, came across various drug paraphernalia and other contraband.
 {¶ 32} The discovery of the drugs and related items was inadvertent in that the police were searching for a gun yet found items such as large amounts of cash, digital scales, as well as substances later to be identified as cocaine and heroin. These objects also have an innate incriminating character which was immediately apparent to the executing officers.
 {¶ 33} Also, soon after the police arrived to execute the search warrant, Cobb exited his home and got in his car, at which time, the police executed an arrest warrant issued on the assault charges. When the police performed a search incident to arrest and inventoried *Page 12 
the contents of Cobb's car, they discovered additional drugs and paraphernalia. Upon viewing the contraband in the home and car, the police then requested another warrant and provided the details of the viewed objects to the magistrate. The police's observation of the drugs and paraphernalia, as detailed in the affidavit that accompanied the request, provided the basis for the second warrant.
 {¶ 34} At the suppression hearing, the trial court recognized that the police were originally limited to searching and seizing the firearm as permitted by the first warrant. The court then concluded, "what the officers then did is what I thought was the appropriate thing to do, which was to get the second warrant. Again executed before a county court judge, the judge believed that there was probable cause and issued the second search warrant. And the Court believes that was the appropriate thing to do. As a matter of fact, I think the officers should be commended for their conduct under the circumstances." We find no error in this conclusion.
 {¶ 35} Upon review, the issuing magistrate had a substantial basis for concluding that probable cause existed. The details given in the affidavit regarding the viewed contraband in the home and seized drugs and paraphernalia from Cobb's car provided the requisite probable cause, and the trial court did not err by denying Cobb's motion to suppress the evidence seized as a result of the second warrant.
 3. Good Faith {¶ 36} In addition to asserting that the warrants lacked probable cause, Cobb asserts that the officers could not rely on the good faith exception to the exclusionary rule. This argument lacks merit.
 {¶ 37} The exclusionary rule will not be applied to bar the use of evidence obtained by officers without a legal search warrant, when the executing officers rely in good faith on the warrant issued by a detached and neutral magistrate even if the warrant is not supported by *Page 13 
probable cause. State v. Macke, Clinton App. No. CA2007-08-033,2008-Ohio-1888. If the officer's reliance is objectively reasonable, the evidence will not be suppressed. Id. However, the good faith exception is not automatically triggered anytime an officer relies on a search warrant, and instead, there are several behaviors that go beyond the reasonable reliance requirement. Leon, 468 U.S. 897. An executing officer cannot have reasonably relied on the warrant when he knows that the supporting affidavit the magistrate relied on is false or misleading, the magistrate wholly abandoned his role, the warrant is facially deficient, or where an officer relies "on the warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. at 923.
 {¶ 38} Cobb argues that the warrant lacked probable cause and that the executing officers could not have relied on it because the affidavit was so lacking in indicia of probable cause as to render their belief in its existence unreasonable. We disagree.
 {¶ 39} The affidavit was supplied by Detective Schweier, a seasoned detective in the West Chester Police Department, Criminal Investigation Section, Youth Aid Unit and from the executing officers' perspective, the affidavit contained details of Cobb's assault on M.B., a report of the abduction, as well as the existence of discernable injuries on her face consistent with an assault. Therefore, we cannot say that the officers would look at the warrant, which had been approved by a magistrate, that described the details of the assault and abduction and determine that it lacked indicia of probable cause so that their reliance on it was not reasonable.
 4. Statements {¶ 40} Cobb asserts that his statements to the police should have been suppressed, as they were the fruits of the illegal warrants. This argument lacks merit.
 {¶ 41} As already indicated, the warrants and subsequent searches were clearly legal and executed properly. Because the exclusionary rule is not applicable under the *Page 14 
circumstances, we will address the statements in context of Cobb'sFifth Amendment rights. When a suspect is the focus of custodial interrogation, he is entitled to receive notice of his privilege against compelled self-incrimination. Miranda v. Arizona (1966), 384 U.S. 436,86 S.Ct. 1602. However, a person may waive his or her rights so long as the waiver is made voluntarily, knowingly, and intelligently. Id.
 {¶ 42} Here, Cobb made several statements to the police, including the written statement in which he described his sexual activities with M.B., as well as a statement regarding an unknown substance found in the refrigerator while the search warrant was executed. However, before he made these statements, Cobb signed a card which stated the following: "I have been advised of all my rights as contained on this card and I understand all of them and I wish to talk to you without having a lawyer present."
 {¶ 43} During the hearing on the motion to suppress, the court took into consideration the signed waiver and the circumstances surrounding Cobb's decision to make statements to police and concluded that Cobb had made "a knowing, intelligent and voluntary waiver of hisMiranda rights." The court then refused to suppress the statements. We find no error in this conclusion.
 5. Effective Assistance Claim {¶ 44} Though Cobb claims that his trial counsel failed to provide him with effective assistance in his handling of the motion to suppress, we disagree. Cobb essentially argues that his counsel's last minute substitution immediately prior to the severance and suppression hearings left his counsel unprepared to challenge the warrants or to fully pursue the motion to suppress. However, a review of the record indicates otherwise.
 {¶ 45} After being appointed, Cobb's trial counsel sought copies of the search warrants and accompanying affidavits and thereafter, prepared an amended motion to suppress. In the motion, counsel set forth the relevant facts and case law and argued that *Page 15 
the evidence and statements should be suppressed for the very same reasons that Cobb asserts on this appeal. The memorandum in support of the motion to suppress also addressed the good faith exception and makes other sound, though ultimately unpersuasive, legal arguments as to why the court should have suppressed the evidence.
 {¶ 46} Cobb's trial counsel made reasonable investigations by procuring the search warrants and affidavits and we cannot say that his preparation or performance was deficient, as it did not fall below an objective standard of reasonableness. Without a showing of deficiency, it cannot be said that Cobb suffered prejudice to the point of depriving him of a fair trial. Unable to establish both prongs of theStrickland test, we conclude that Cobb received effective assistance of counsel during the suppression phase of his trial.
 {¶ 47} Having concluded that both search warrants were supported by probable cause, Cobb made his statements after a voluntary waiver of hisMiranda rights, and that he received effective assistance of counsel during his attempt to suppress evidence, Cobb's first assignment of error is overruled.
 IV. Entrapment {¶ 48} Assignment of Error No. 2:
 {¶ 49} "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO RAISE A VALID ENTRAPMENT DEFENSE AT TRIAL."
 {¶ 50} In his second assignment of error, Cobb argues that his trial counsel should have raised an entrapment defense and that his failure to do so constituted ineffective assistance of counsel. Essentially, Cobb argues that his attorney should have tried to convince the jury that he would not have committed the drug trafficking crimes for which he was convicted if the agent had not induced him to do so. This argument is unpersuasive.
 {¶ 51} Because entrapment is an affirmative defense, the defendant must prove its *Page 16 
elements by a preponderance of the evidence. R.C. 2901.05(A). Entrapment exists "where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." State v. Doran (1983), 5 Ohio St.3d 187
at paragraph one of the syllabus. When mounting an entrapment defense, the defendant admits participation in the criminal activity but then attempts to excuse involvement by claiming that the criminal design originated with the government officials. Doran.
 {¶ 52} There is no entrapment when government officials merely provide opportunities or facilities for the commission of a crime to a defendant when that defendant is predisposed to commit the offense. Id. The defendant asserting the entrapment defense must adduce evidence supporting his lack of predisposition to commit the offense. Id. A defendant who is ready and willing to break the law cannot claim entrapment simply because the government provided a means to do so. Id.
 {¶ 53} Though Cobb asserts that his counsel's assistance was ineffective due to his failure to raise an entrapment defense, we do not agree. First, Cobb's counsel's performance did not fell below an objective standard of reasonableness, as the choice to not raise the defense would fall squarely within counsel's trial strategy latitude. If Cobb's counsel had raised the defense, Cobb would have admitted his participation in the drug trafficking and then been forced to offer evidence that he was not predisposed to commit the crime. Had he done so, the prosecution could have presented evidence of its own that Cobb was predisposed to commit the crime, such as offering evidence of his prior criminal history or by cross-examining Cobb regarding his account of the drug transactions.[5] The choice to keep *Page 17 
this and other potentially damaging testimony and evidence away from the jury is certainly a reasonable decision and Cobb's counsel showed no deficiency in his trial strategy.
 {¶ 54} Second, Cobb is unable to demonstrate a reasonable probability that, but for counsel's actions, the result of his trial would have been different. Had Cobb's counsel pursued an entrapment defense, Cobb could not have provided evidence supporting his lack of predisposition to commit drug trafficking offenses.
 {¶ 55} When determining a defendant's predisposition to commit the offense, a court will take into consideration the following factors: "1) the accused's previous involvement in criminal activity of the nature charged; 2) the accused's ready acquiescence to the inducements offered by the police; 3) the accused's expert knowledge in the area of the criminal activity charged; 4) the accused's ready access to contraband; and 5) the accused's willingness to involve himself in criminal activity." Doran at 192.
 {¶ 56} After reviewing the record, it is clear that Cobb was predisposed to traffic drugs, whether or not the undercover agent offered to purchase them. Cobb was already a documented dealer as evidenced by him selling to the confidential informant even before the BCI undercover operation began. The initial search of his home, performed before the agent bought drugs from Cobb, also uncovered drug paraphernalia and objects used in the sale of drugs such as a digital scale and substances used to turn crack cocaine into power cocaine. The agent also testified that as soon as he asked Cobb to sell him drugs, Cobb readily acquiesced by agreeing to get the drugs the agent requested and setting up the exchange meeting. As substantiated by the recorded phone calls between Cobb and the agent, Cobb also demonstrated an expert knowledge of criminal activity by using drug-related jargon, such as referring to the drugs by their street name, and being well conversed in the types of *Page 18 
narcotics, amounts, and ability to change crack cocaine into powder.
 {¶ 57} Cobb also had ready access to the drugs. Although Cobb would normally schedule an exchange meeting for a day or two in the future so that he could procure the type and amount of drugs requested, Cobb consistently came through on his promise to provide the drugs. Cobb argues that he did not typically sell cocaine and that the agent's repeated requests for cocaine induced him to sell it when he would not otherwise have done so. Although Cobb called himself a "heroin boy" in his recorded phone calls to the agent, Cobb repeatedly provided the requested cocaine and did so within a short time of the agent's request. The recorded phone calls also reveal that Cobb continually sold the agent various types of drugs and in varying quantities, often told the agent that that no other dealer could beat his price, and told the agent he could give him whatever he wanted. Therefore, Cobb's own words and actions demonstrate his abiding willingness to involve himself in the criminal activity. Even if Cobb's counsel has pursued the entrapment defense, we cannot say that the trial's result would have been different, so that Cobb fails to show how counsel's trial strategy prejudiced him.
 {¶ 58} Having failed on both prongs of the Strickland test, Cobb cannot prove that his counsel's assistance was ineffective in not raising an entrapment defense. Accordingly, Cobb's second assignment of error is overruled.
 V. Joinder {¶ 59} Assignment of Error No. 3:
 {¶ 60} "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO RENEW HIS OBJECTION TO JOINDER OF OFFENSES AT THE CONCLUSION OF THE STATE'S CASE."
 {¶ 61} In his third assignment of error, Cobb argues that his counsel's assistance was *Page 19 
ineffective because counsel failed to renew his objection to the trial court's denial of Cobb's motion to sever.[6] This argument lacks merit.
 {¶ 62} According to Crim. R. 8(A), multiple offenses may be joined in a single trial if the offenses charged are of the same or similar circumstances.[7] State v. Franklin (1991), 62 Ohio St.3d 118. However, Crim. R. 14 also permits a court to sever the charges and grant separate trials if joinder has a prejudicial effect on the accused.
 {¶ 63} Assuming arguendo that counsel's failure to renew the objection fell below an objective standard of reasonableness to the point that it constituted deficiency, Cobb is not able to show that he was prejudiced and that a different result would have occurred had the objection been renewed. Instead, and even if counsel had objected, there is no indication that the trial court would have severed the counts or that Cobb would not have been convicted of the crimes. Regarding his right to appeal the matter to this court, we also note that had counsel preserved the objection, we would have affirmed the decision of the trial court to deny Cobb's motion to sever.
 {¶ 64} "To prevail on his claim that the trial court erred in denying his motion to sever, the defendant has the burden of demonstrating three facts. He must affirmatively demonstrate (1) that his rights were prejudiced, [8] (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations *Page 20 
favoring joinder[9] against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial."Schaim at 59. "Claims of prejudice are less persuasive where the evidence is `amply sufficient to sustain each verdict, whether or not the indictments were tied together.'" Sapp at ¶ 73, citing State v.Torres (1981), 66 Ohio St.2d 340, 344.
 {¶ 65} While Cobb did provide the court with sufficient information to weigh the considerations of joinder and severance, he fails to show that his rights were prejudiced or that the court abused its discretion. In his motion to sever, Cobb argued that the crimes for which he was indicted were not of the same or similar circumstances because sexual assault does not involve the same factual or evidentiary standard as the drug-related crimes. Cobb also argued that the jury would not be able to segregate the evidence if all counts were prosecuted so that joinder would be prejudicial.
 {¶ 66} At the hearing, Cobb was represented by his trial counsel who argued that Cobb would be prejudiced if the jury used their feelings regarding the nature of the sexual assault charge to decide the drug-related crimes. Counsel also argued that the crimes were separate acts and unrelated to each other so that a presentation of evidence on one crime was not pertinent to the others, thus resulting in prejudice.
 {¶ 67} However, after the trial court concluded that the crimes were of similar circumstance because the facts regarding the various counts were intertwined, it denied Cobb's motion. After reviewing the record, we find no error in this conclusion.
 {¶ 68} As referenced by the trial court, the facts are highly intertwined and testimony regarding the assault and abduction charges was also pertinent to the drug-related crimes. *Page 21 
Furthermore, evidence regarding Cobb's retaliation against M.B. was also pertinent to the decision to arrest Cobb before establishing the extent of his drug business.
 {¶ 69} Although the facts in this case are numerous and intertwined, they are not so difficult as to demand severance out of an unfounded fear that the jury would consider the volume or cumulative effect of evidence instead of basing its decision on whether or not the state met its burden of proof on every element of each crime. See Torres at 344 (stating that joinder is not prejudicial where "the evidence is direct and uncomplicated and can reasonably be separated as to each offense").
 {¶ 70} Moreover, we also note that the evidence was amply sufficient to sustain each verdict[10] so that any residual prejudicial impact was nullified. It is clear from the record that the prosecution did not attempt to prove one charge by relying on a cumulative effect of all 16 counts or by joining the crimes against M.B. with the drug-related offenses.
 {¶ 71} Even if counsel's failure to renew his objection had amounted to deficiency under Strickland, Cobb fails to show how he was prejudiced. As discussed, the trial court did not abuse its discretion in denying the motion to sever and no reasonable probability exists that the trial would have had a different result if counsel had renewed the objection and severance been granted. Further, because we have addressed the merits, counsel's failure has not caused Cobb to forfeit review of the issue on appeal. Because he cannot claim ineffective assistance of counsel regarding his severance request, and because joinder was procedurally appropriate under Crim. R. 13, Cobb's third assignment of error is overruled.
 VI. Evidentiary Issues {¶ 72} For ease of discussion, we will address Cobb's fourth and fifth assignments of error together. *Page 22 
 {¶ 73} Assignment of Error No. 4:
 {¶ 74} "APPELLANT RECEIVED INEFFECTIVE ASSITANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO OBJECT TO THE STATE'S PLAYING A ONE-SIDED TAPED TELEPHONE CONVERSATION."
 {¶ 75} Assignment of Error No. 5:
 {¶ 76} "APPELLANT WAS PREJUDICED THROUGH THE COURT'S ADMISSION OF EVIDENCE CONCERNING A BREAK-IN AT [M.B.'S] RESIDENCE."
 {¶ 77} In his fourth and fifth assignments of error, Cobb argues that the trial court improperly permitted the jury to hear a one-sided taped phone call and evidence of a break in at M.B.'s home. In the first instance, Cobb's counsel did not object to the tape's relevancy and in the second, the trial court admitted the evidence over counsel's objection. As to the evidence, Cobb argues that the probative value was outweighed by the prejudicial impact the evidence would have on the jury. This argument lacks merit.
 {¶ 78} Generally, the decision to admit or exclude relevant evidence lies within the sound discretion of the trial court. State v.Rivera-Carillo, Butler App. No. CA2001-030-054, 2002-Ohio-1013. According to Evid. R. 401, "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determ ination of the action more probable or less probable than it would be without the evidence." However, Evid. R. 403 also demands mandatory exclusion of the evidence if "although relevant * * * its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
 {¶ 79} Before a court's decision regarding evidence will be disturbed, the appellant must show that the trial court abused its discretion by deciding to admit or exclude the evidence and that the appellant was materially prejudiced thereby. State v. Martin (1985),19 Ohio St.3d 122. *Page 23 
 A. Phone Call {¶ 80} Regarding the evidence of the one-sided taped phone call, Cobb argues that his counsel was ineffective by failing to object to its admittance. However, even if counsel's failure amounted to deficiency, [11] Cobb is unable to prove that his trial's outcome would have been different had counsel objected. Instead, the record does not indicate that the trial court would have had reason to exclude the recorded phone call or that without the phone call, Cobb would have been acquitted.
 {¶ 81} First, the trial court had no reason to exclude the evidence, as the call was relevant in that it demonstrated to the jury Cobb's intent to retaliate against M.B. should she chose to testify or levy any charges against him. Specifically, the jury heard Cobb threaten M.B. by stating that he knew where her family lived, worked, and attended church and then added: "you better believe, you best better believe that any move you make, be careful because when it pop off it ain't gonna come back to me."
 {¶ 82} Soon after the phone call, M.B. was assaulted when a man attacked her at a local bus stop and was then seen fleeing in the car in which Cobb was a passenger. Subsequent to the phone call, M.B.'s home was also broken into and her family's personal property was stolen or damaged. After hearing the phone call and considering other evidence, the jury was free to make an inference that the threats contained in the phone call were soon-after carried out by Cobb.
 {¶ 83} Second, the phone call was not prejudicial in that even if it had not been admitted, M.B. testified to the events so that the jury would have heard her account of receiving the phone call, feeling threatened, being attacked, and having her home broken *Page 24 
into. Therefore, it cannot be said that had Cobb's counsel objected, the evidence would not have been admitted or that Cobb's trial would have had a different outcome. Having failed to show that counsel's failure to object prejudiced him in any way, Cobb is unable to demonstrate that his counsel's assistance was ineffective.
 B. Evidence of the Break-In {¶ 84} Cobb next contends that the trial court erred in admitting evidence concerning a break-in of M.B.'s home because the probative value of the testimony and photographic evidence was outweighed by its prejudicial effect. Specifically, Cobb contends that he made no threat to burglarize M.B.'s home and there was no further evidence of his involvement in the offense.
 {¶ 85} Cobb was charged with retaliation in violation of R.C. 2921.05(B) which states: "No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against the victim of a crime because the victim filed or prosecuted criminal charges." In addition to Cobb's repeated threats in the recorded phone call, as well as being a party to the attack on M.B. at the bus stop, the jury heard evidence that M.B.'s home was broken into shortly after M.B. returned to Ohio and received the phone call from Cobb.
 {¶ 86} While Cobb argued that the photographs and testimony regarding the break-in were prejudicial, the trial court overruled the objection, finding that the prejudicial effect was outweighed by its probative value. "It's a 403 issue and I believe that the jury would have a right to make an inference based on the facts and circumstances of this case that this was a part of a course of conduct to try to intimidate the witness. So I'm going to let it in." We find no error in this conclusion.
 {¶ 87} The jury was free to consider the fact that the state did not produce any evidence explicitly tying Cobb to the break-in and could have discounted the circumstantial connection between the phone call and the break-in, thus curtailing any prejudice the *Page 25 
evidence might have had. Additionally, the probative value outweighed any prejudicial effect because the state offered other evidence of Cobb's retaliation. Mainly, had the evidence not been admitted through the photographs and testimony of the break-in, M.B. still would have testified to her first-hand account of the other threats Cobb made and the police could have explained their decision to arrest Cobb before their investigation was complete due to their fear for M.B.'s safety.See Martin, 19 Ohio St.3d 128-129 (affirming the trial court's decision that the evidence's probative value outweighed any prejudicial effect when the evidence "was not particularly essential to the state's case, but cumulative in nature").
 {¶ 88} Because the evidence's probative value outweighed its prejudicial impact, and because it was otherwise relevant to the retaliation charge, the trial court did not abuse its discretion by admitting testimony and photographs depicting the break-in.
 {¶ 89} Having found that Cobb's arguments lack merit, his fourth and fifth assignments of error are overruled.
 VII. Manifest Weight and Sufficiency of Evidence {¶ 90} Assignment of Error No. 6:
 {¶ 91} "APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OR THE SUFFICIENCY OF THE EVIDENCE."
 {¶ 92} In his sixth assignment of error, Cobb argues that eight of his 16 convictions were against the manifest weight or sufficiency of the evidence. This argument is unpersuasive.
 {¶ 93} Manifest weight and sufficiency of the evidence are quantitatively and qualitatively different legal concepts. State v.Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. State v. Wilson, Warren App. No. CA2006-01-007, 2007-Ohio-2298. *Page 26 
When addressing sufficiency, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 94} While the test for sufficiency requires an appellate court to determine whether the state has met its burden of production at trial, a manifest weight challenge examines the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. Wilson. "In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the tier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Cummings, Butler App. No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.
 {¶ 95} While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." State v.Walker, Butler App. No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. Thompkins,78 Ohio St.3d at 387.
 {¶ 96} "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Wilson at ¶ 35, citingState v. *Page 27 Lombardi, Summit App. No. 22435, 2005-Ohio-4942, fn. 4.
 A. Felonious Assault {¶ 97} Cobb first challenges his conviction of felonious assault against M.B. R.C. 2903.11(A)(2) forbids a person from "caus[ing] or attempting] to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 98} According to the record, the jury heard testimony from M.B. that Cobb hit her on the head with a gun so hard that the clip fell out. M.B.'s injuries were apparent to both her mother and the police when she went into the station to make a report of the crime, and the original search warrant referenced injuries on M.B.'s face. Cobb argues that M.B. originally reported that Cobb had hit her on the side of the head, but that her injuries above her eye and lip proved incompatible with that statement so that the conviction was not supported by the evidence. Cobb also asserts that M.B. was not a credible witness because of this and other inconsistencies in her testimony. However, the jury was free to determine M.B `s credibility during direct and cross-examination, as well as the testimony from the detective who took her statement, and determine that the weight of the evidence favored the state's position. We find the evidence supporting Cobb's conviction for felonious assault to be credible, and cannot say that the jury clearly lost its way or created a manifest miscarriage by finding Cobb guilty.
 B. Possession of Drugs and Firearm Specification {¶ 99} Cobb challenges his convictions of three counts of drug possession, one with a firearm specification.[12] Cobb argues that he did not possess the drugs or the firearm so that his convictions on these counts were against the manifest weight of the evidence. R.C. 2925.01(K) defines possession as "having control over a thing or substance" but it "may not *Page 28 
be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."
 {¶ 100} The accused may be in actual or constructive possession or control of the drug. State v. Contreras, Butler App. No. CA2004-07-181,2006-Ohio-1894, ¶ 21. Constructive possession exists when one is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within one's immediate physical possession. State v. Gaefe, Clinton App. No. CA2001-11-043, 2002-Ohio 4995, ¶ 9. The discovery of readily accessible drugs in close proximity to a person constitutes circumstantial evidence that the person was in constructive possession of the drugs. Contreras at ¶ 24.
 {¶ 101} Cobb argues that when he was arrested during the execution of the search warrant, he was not in possession of any drugs or a firearm and that no firearm was located in his car or in the garage from which he exited. Cobb was charged with one count of possession of cocaine, constituting count four, when drugs were located in his garage during the initial search. Count five is based on the heroin located in the center console during the inventory search of his car after Cobb's first arrest. Count 14 includes the cocaine found in the car[13] at the final transaction between the undercover agent and Cobb on the night that he was arrested the second time.
 {¶ 102} It is undisputed that Cobb rented the home in which the drugs were found and that he was a passenger in the car and sitting directly in front of the drugs. Cobb therefore had dominion and control over the premises in which the drugs were located. The record also indicates that Cobb was conscious of the drugs because in the first instance, he took the steps to hide them in his garage and in the consol of his car. Though the drugs in the back of the car presents a less concrete consciousness, the jury was free to use circumstantial *Page 29 
evidence to conclude that Cobb was aware of the bag of drugs sitting on the floorboard of the seat directly behind him. Specifically, the jury heard testimony that Cobb agreed to sell the undercover agent the drugs, Cobb then showed up to the exchange meeting ready to sell, and that police located the same type and quantity of drugs Cobb had promised, directly behind his seat. See State v. Cummings, Butler App. No. CA2006-09-224, 2007-Ohio-4970, ¶ 16 (affirming conviction though evidence used to convict the appellant was circumstantial because "circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can be established only by circumstantial evidence. Moreover, a conviction based solely on circumstantial evidence is no less sound than one based on direct evidence").
 {¶ 103} Regarding the firearm specification, Cobb argues that he did not possess a gun when the drugs were found in his garage or in the cars in which he was located. By its verdict, the jury rejected Cobb's argument. After reviewing the record, credible evidence supported the jury's verdict that Cobb constructively possessed the firearms. Here, the jury heard testimony that Cobb was in possession of both the drugs and the firearms before the police arrived at Cobb's residence to execute the warrant. Executing officers testified that they seized multiple guns from Cobb's bedroom closet as well as additional ammunition. Additionally, Cobb walked straight to the closet and retrieved the gun he used to assault M.B. From this evidence, the jury concluded that Cobb was conscious of the weapons' presence in his home and that he exercised dominion and control over them. Construing this credible evidence in a light most favorable to the prosecution, the jury did not lose its way in finding as such, and the fire arm specification is supported by the manifest weight of the evidence.
 C. Trafficking in Crack Cocaine {¶ 104} Cobb argues that his convictions on counts nine and twelve were not based on the manifest weight of the evidence. R.C. 2925.03(A)(1) provides that "No person shall *Page 30 
knowing do any of the following: (1) Sell or offer to sell a controlled substance." The two counts covered Cobb's offer to sell crack cocaine to the undercover officer on multiple occasions during BCI's ongoing investigation. However, Cobb argues that because there were instances where he did not actually show up to the exchange and did not sell the agent the requested drugs, that he did not traffic in crack cocaine.
 {¶ 105} During his trial, the jury heard numerous taped phone conversations between Cobb and the undercover agent in which Cobb offered and agreed to sell the agent crack cocaine. Though on one occasion Cobb did not show up to the exchange meeting and on another he sold the agent powder cocaine instead of crack cocaine, the jury heard Cobb offer to sell the crack cocaine. As permitted by the statute, a defendant may be convicted if he offers to sell a controlled substance and the jury did not lose its way by concluding that Cobb's offer to sell to the agent constituted trafficking in crack cocaine.
 D. Engaging in a Pattern of Corrupt Activity {¶ 106} Cobb argues that his conviction of one count of engaging in a pattern of corrupt activity was not supported by the manifest weight of the evidence. According to R.C. 2923.32(A)(1), "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. 2923.31(E) defines pattern of corrupt activity as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."
 {¶ 107} Cobb reiterates his entrapment argument in order to suggest that he never engaged in single acts of drug trafficking so that he could not have been convicted of engaging in a pattern of corrupt activity. However, the jury heard testimony from the *Page 31 
undercover agent, as well as the recorded phone calls, that offered credible evidence that Cobb sold drugs on multiple occasions. The jury considered this evidence and concluded that Cobb had sold drugs first to a confidential informant and then on separate occasions to the undercover agent. The sales did not constitute a single event, as they were made on separate days and to different buyers, and after reviewing the record, we conclude that the jury did not lose its way when it convicted Cobb of engaging in a pattern of corrupt activity.
 E. Abduction {¶ 108} Cobb also argues that his conviction on one count of abduction was against the manifest weight of the evidence. In pertinent part, R.C. 2905.02(A)(2) states, "(A) No person, without privilege to do so, shall knowingly do any of the following: (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." However, Cobb argues that he did not abduct M.B. at any time because even if he used threats against her to make her stay in the bedroom, the threats were conditional.
 {¶ 109} Cobb argues he merely told M.B. to go into the bedroom and that even if he had threatened her with a gun or told her that her mother would not be able to find her body, these threats were conditional so that he had not exerted any force against M.B. in order to restrain her liberty. However, at trial, the prosecution offered evidence that on the morning after M.B.'s mother had reported her missing, Cobb did force M.B. to stay in his home until the police left. M.B. testified that when the police came to question Cobb regarding her whereabouts, that Cobb forced M.B. to stay in the bedroom, on the side away from the door, and then told her that if she tried to leave, he would harm her family and engage in a shoot out with police.
 {¶ 110} The jury concluded, as do we, that these threats were meant to restrain M.B.'s liberty to leave the room, and/or Cobb's home. Cobb had already demonstrated his violent *Page 32 
tendency toward M.B. by hitting her with a gun, and it is reasonable to conclude that M.B. stayed where she was commanded out of a risk of physical harm to herself or a general fear that a shoot out would occur. Knowing that Cobb kept a gun in his closet, M.B. had reason to believe that Cobb would implement his threat so that the conditional nature of the threat does not nullify its ability to inflict fear or a risk of physical injury. This credible evidence demonstrates that the jury did not lose its way when it convicted Cobb of abduction.
 {¶ 111} Having concluded that all of Cobb's convictions were supported by the manifest weight of the evidence, thus disposing of the sufficiency argument in the process, Cobb's sixth assignment of error is overruled.
 VIM. Prosecutorial Misconduct {¶ 112} Assignment of Error No. 7:
 {¶ 113} "APPELLANT WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL IN THAT REGARD."
 {¶ 114} In his seventh assignment of error, Cobb argues that during the state's closing argument, the prosecutor misstated the state's burden regarding the firearm specification and that the trial court did not take sufficient steps to dissipate the taint of the prosecutor's remark. Further, Cobb claims that his trial counsel's failure to object to these portions of the prosecutor's closing argument resulted in ineffective assistance of counsel. These arguments lack merit.
 {¶ 115} When reviewing statements during closing arguments for prosecutorial misconduct, a prosecutor is granted a certain degree of latitude.[14] State v. Smith (1984), 14 Ohio St.3d 13. "A prosecutor may comment upon the testimony and suggest the conclusions *Page 33 
to be drawn from it, but a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused, or go beyond the evidence which is before the jury when arguing for conviction." State v. Smith, Butler App. No. CA2007-05-133,2008-Ohio-2499, ¶ 7. Prosecutorial misconduct will only be found when remarks made during closing were improper and those improper remarks prejudicially affected substantial rights of the defendant. State v.Elmore, 111 Ohio St.3d 515, 2006-Ohio-6207. In order to determine whether the remarks were prejudicial, the prosecutor's closing argument is reviewed in its entirety. State v. Treesh, 90 Ohio St.3d 460,2001-Ohio-4.
 {¶ 116} The Ohio Supreme Court has held that prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial because of the prosecutor's prejudicial remarks. Murphy. "We will not deem a trial unfair if, in the context of the entire trial, it appears beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." Smith,2008-Ohio-2499 at ¶ 9.
 {¶ 117} Initially, we note that Cobb failed to raise any objections at trial regarding prosecutorial misconduct. Therefore, this argument has been forfeited unless we find plain error. See Crim. R. 52(B). Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceedings. State v. Barnes, 94 Ohio St.3d 21, 2002-Ohio-68. The defendant must show a violation of his substantial rights and even then, notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Landrum (1990), 53 Ohio St.3d 107.
 {¶ 118} Cobb argues that the prosecutor misinformed the jury as to the burden of proof necessary to find that Cobb was guilty of possessing a firearm while committing the drug-possession offense. During closing, the prosecutor stated that the state's burden on the forfeiture specification was the greater weight of the evidence. Soon after, he stated that the *Page 34 
gun specification was similar. Cobb also complains of the prosecutor's statement to the jury that even if they believed that Cobb's roommate owned the drugs, he could still be found guilty of possession, as the state was only required to prove Cobb's ability to exert control.[15]
 {¶ 119} However, these specific and truncated statements cited in Cobb's brief are taken out of context because if read in isolation they may appear to be legally incorrect. However, when read in context with the whole of the argument, the statements were not prejudicial nor did they cause Cobb to have an unfair trial.
 {¶ 120} Instead, the prosecutor explained to the jury that they would receive instructions on different levels of proof required for the conviction. Specifically, though the prosecutor incorrectly compared the forfeiture burden to the firearm specification, Cobb's counsel requested a clarification of the burdens and the court complied by reminding the jury, "the one thing that I was asked to make sure you understand as to the firearm specification and the finding of amounts of drugs, that that must be made on evidence by proof beyond a reasonable doubt. The forfeiture is only decided by the greater weight of the evidence." Therefore, when taken as a whole, the jury could not have been misled by the prosecutor's passing comparison of the two standards.
 {¶ 121} The prosecutor also explained to the jury that Cobb could not be convicted for possession of drugs simply because they were located in an area that Cobb owned. Instead, the prosecutor reminded the jury that it was entitled to consider the other facts and circumstances in the case and use the circumstantial evidence to conclude that the drugs were in Cobb's possession.[16] Not only was the prosecutor's statement legally sound, but *Page 35 
also there was no misinformation provided to the jury from which any prejudice would arise.
 {¶ 122} Additionally, the jury instructions contain the "beyond a reasonable doubt" standard and also detail the standard necessary to find Cobb guilty of possession.[17] Therefore, it is clear that the jury was instructed as to the proper burden of proof, as well as its ability to use circumstantial evidence to support a finding of constructive possession, and we must presume that the jury followed the trial court's instructions. See State v. Manns, Clark App. No. 2005 CA 131, 2006-Ohio-5802. Because the prosecutor's statements were not a deviation from a legal rule which affected Cobb's substantial rights, or influenced the outcome of the proceedings, there is no plain error.
 {¶ 123} Further, Cobb's assistance was effective even though his trial counsel did not object to the prosecutor's statements regarding the burden of proof on the firearm specification or constructive possession. As already stated, Cobb's trial counsel asked the court to clarify the difference between the burdens of proof necessary for forfeiture and a firearm specification. Therefore, counsel was not deficient by not objecting to a statement that was twice clarified by the court in a direct address to the jury and by its instructions to the jury. Additionally, as the prosecutor's statements regarding constructive possession were not improper and had no prejudicial impact on Cobb, trial counsel's failure to object was not deficient.
 {¶ 124} However, even if the failure to object had been deficient, Cobb is unable to show that had his counsel objected, the result of his trial would have been different. Had counsel objected, there is no indication that the trial court had any reason to sustain the *Page 36 
objection. Even if the court had chosen to strike the prosecutor's statements and instruct the jury to disregard them, the jury would have still received the jury instructions which contained the correct burdens of proof and legal standard of constructive possession. Here, the jury clearly found the evidence supported guilty verdicts on both counts and due to the amount of evidence in favor of Cobb's guilt, it does not appear that his trial would have had a different outcome absent the prosecutor's statements. Having found no prosecutorial misconduct and that Cobb received effective assistance during the state's closing argument, Cobb's seventh assignment of error is overruled.
 IX. Sexual Predator Designation {¶ 125} Assignment of Error No. 8:
 {¶ 126} "THE TRIAL COURT ERRED IN DESIGNATING APPELLANT A SEXUAL PREDATOR."
 {¶ 127} In his eighth assignment of error, Cobb argues that the state failed to prove that he was a sexual predator because there was no evidence that he is likely to reoffend. This argument is unpersuasive.
 {¶ 128} According to R.C. 2950.01(E), a sexual predator is a person who has been convicted of or pleaded guilty to committing a sexually-oriented offense and is likely to engage in one or more sexually-oriented offenses in the future. Because Cobb was found guilty of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), a sexually-oriented offense, the sole issue before the trial court in determining whether or not Cobb was a sexual predator was his likelihood of committing one or more sexually-oriented offenses in the future.
 {¶ 129} In determining an offender's likelihood of recidivism, the trial court was to *Page 37 
consider all relevant factors as listed in R.C. 2950.09(B)(3)[18]
which include the offender's: age, prior criminal or delinquent history, as well as the age of the victim, whether there were multiple victims, whether the offender used drugs or alcohol to impair the victim, whether the offender had a juvenile record, if the offender had a mental illness or disability, the nature of the offender's sexual conduct or if it was part of a demonstrated pattern of abuse, whether the offender displayed cruelty or made threats of cruelty during the commission of the sexual offense, as well as any additional behavioral characteristics that contribute to the offender's conduct.
 {¶ 130} The weight to be given the statutory factors is within the discretion of the trial court. State v. Wells, Butler App. No. CA2006-03-064, 2007-Ohio-42. For that reason, a trial court may rely on one factor more than another and is not required to find that the evidence supports a majority of these factors. State v. Harper, Butler App. No. CA2006-06-132, 2007-Ohio-3611. Upon reviewing the factors in light of the testimony and evidence presented, the trial court must determine by clear and convincing evidence whether the offender can be classified as a sexual predator. R.C. 2950.09(B)(4). Clear and convincing evidence is that which "will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." State v. Eppinger, 91 Ohio St.3d 158, 164, 2001-Ohio-247.
 {¶ 131} We disagree with Cobb's argument that he is not a threat to re-offend based on the fact that the relationship was consensual and that he has no other history of similar sexual offenses. The offense for which Cobb was convicted, unlawful sexual conduct with a *Page 38 
minor in violation of R.C. 2907.04, applies when any person above 18 engages in sexual conduct with another who is between 13-16 years old, whether or not the minor consents to the conduct. Whether or not M.B. consented to a sexual relationship with Cobb, the fact remains that he is guilty of the offense. Further, while Cobb does not have a history of sexually-oriented offenses, an offender may be classified as a sexual predator after committing a single sexually-oriented offense so long as the record contains clear and convincing evidence that the offender is likely to commit a sexually-oriented offense in the future.Harper.
 {¶ 132} Pertinent to the recidivism factors, the trial court heard testimony regarding Cobb's sexual relationship with M.B. Specifically, it heard that Cobb began having sexual relations with M.B. when she was 15 years old and that by his own admission, the relations were sometimes violent in nature. Additionally, the court heard testimony that Cobb assaulted M.B. on numerous occasions and that threats and intimidation were commonplace in their relationship.
 {¶ 133} Regarding Cobb's additional behavioral characteristics that contribute to his conduct, the trial court also considered Cobb's violent behavior and disdain for the law. Soon after his arrest, Cobb told the officers "I'll beat these charges just like I did with the last ones, now that you've Barney Fife'[d] me again. I'll be able to buy myself a good jury to beat these charges." After the jury returned guilty verdicts, the court ordered a presentence investigation report. However, when the officer attempted to conduct the investigation interview as ordered by the court, Cobb refused to cooperate and told the officer, "I've beaten a lot of cases and I know this one should be beaten. I plan on appealing this." Though he refused to cooperate, the presentence investigation report did reveal Cobb's juvenile record which included a domestic violence charge stemming from an incident in which Cobb punched his father and threatened to kill him and then put his mother in a choke-hold while he held her *Page 39 
down on his bed.
 {¶ 134} Taking this evidence into consideration, the trial court recognized that the test it faced was whether or not Cobb would commit future sexually-oriented offenses. During the disposition hearing, the court concluded: "The Court believes that [Cobb] exhibits all the traits of a sociopathic personality, which means essentially he has no conscience and no moral code or compass; that he goes by his conduct, not only as to this particular offense, but all the offenses [sic] he's rather egregious and shows total disregard for authority. And I believe that there is clear and convincing evidence that if he had the opportunity to do it again, he would do it again without remorse." We find no error in this conclusion.
 {¶ 135} Having reviewed the record, we conclude that the trial court's sexual predator determination is supported by clear and convincing evidence so that his eighth assignment of error is overruled.
 X. Sua Sponte Issues {¶ 136} After reviewing the record, this court makes notice of two sentencing issues that must be corrected by the trial court.
 {¶ 137} First, as pointed out in the state's brief, Cobb was convicted of possession of cocaine as a fourth-degree felony while he was sentenced as if it were a second-degree felony. Count fourteen of the original indictment charged Cobb with possession of cocaine, a second-degree felony based on the amount originally included in the indictment. However, the state then moved the court to amend the indictment once it received confirmation that the amount was actually 13.83g which would qualify the possession as a fourth-degree felony. The jury convicted Cobb of possession and made a special finding that the amount was between five grams, but less than 25 grams. However, the court, in its sentencing entry, sentenced Cobb to eight years imprisonment which is not within the range of a fourth-degree felony, but rather, is the maximum prison term for a second-degree felony. *Page 40 
 {¶ 138} Second, in its judgment entry, the trial court erroneously listed Cobb's sentence of 10 years for his conviction on count twelve, trafficking in cocaine, to run consecutively to count fifteen. However, after reviewing the transcript of the disposition hearing and the Department of Rehabilitation and Correction's notice of commitment and calculation of sentence, it is clear that the court intended the sentence to run concurrently with the other sentences.
 {¶ 139} While these two changes will not have an impact on the aggregate sentence of 29 years, the trial court's sentence must adhere to the sentencing guidelines as set forth in R.C. 2929.14 and the judgment entry needs to reflect the final decision of the trial court as to its ruling. We therefore remand in order for the trial court to correct its sentencing entries.
 XI. Conclusion {¶ 140} Having found Cobb's eight assignments of error without merit, we affirm the convictions and remand so that the trial court may correct its sentence entry specific to count fourteen and to reflect a concurrent sentence under count twelve.
WALSH, P.J., and YOUNG, J., concur.
[1] Cobb was born June 3, 1986 so that at the time he met M.B. in April of 2005, he would have been approximately two months shy of his 19th birthday.
[2] In total, 0.84g of heroin, 28.73g of powder cocaine, 3 loaded handguns, a digital scale, a marijuana pipe, signs of additional weapons that were not located, and $31,274 cash were seized from Cobb's apartment, car, and garage.
[3] "While it is desirable to have the affiant provide as much information as possible from his own knowledge, practical considerations often require the affiant to rely on hearsay information and/or information provided by other sources." State v. Young, Clermont App. No. CA2005-08-074, 2006-Ohio-1784, ¶ 21.
[4] The warrant permitted the police to search for "certain goods and chattels or articles, to wit: firearms, namely a black semi automatic .38 handgun and other contraband articles or things alleged in the affidavit hereto attached and made part hereof to be unlawfully possessed * * *."
[5] "The accused, as a participant in the commission of the crime, will be aware of the circumstances surrounding the crime, and is at no disadvantage in relaying to the fact finder his version of the crime as well as the reasons he was not predisposed to commit the crime.' Although there may theoretically be alternative ways of proving lack of predisposition to commit an offense, a defendant may feel compelled, as a practical matter, to testify on that subject to meet his burden of proof, just as a defendant in a murder case may feel compelled, as a practical matter to testify on the issue of self-defense to meet his burden of proof on that issue." State v. Bowshier, Clark App. No. 06-CA-41, 2007-Ohio-5364, ¶ 141-142, citing Doran.
[6] If the defendant files a motion to sever, but ultimately fails to renew the objection at the close of either the state's case or presentation of all evidence, he waives the joinder issue on appeal.State v. Sapp, 105 Ohio St.3d 104, 2004-Ohio-7008.
[7] In full, the rule states: "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim. R. 8(A).
[8] "Where the evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of a criminal disposition is largely absent." State v. Hamblin (1988),37 Ohio St.3d 153, 159.
[9] "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." State v. Schaim,65 Ohio St.3d 51, 58, 1992-Ohio-31.
[10] See Cobb's sixth assignment of error addressing his manifest weight and sufficiency arguments.
[11] In State v. Johnson, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, the Ohio Supreme Court recognized that a single failure to object "usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."
[12] R.C. 2941.141(A) permits a one-year mandatory prison term if the offender had a firearm "on or about the offender's person or under the offender's control while committing the offense."
[13] The cocaine was contained in a baggie and located on the floorboard behind the passenger's seat where Cobb was sitting.
[14] "The focus of an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon culpability of the prosecutor." State v. Murphy, Butler App. No. CA2007-03-073,2008-Ohio-3382, ¶ 9.
[15] Before the prosecutor and defense counsel gave their closing arguments, the court reminded the jury that the "statements of attorneys are not evidence" twice and then later told the jury that at the close of the state's rebuttal argument, it would read the jury instructions and discuss the verdict forms.
[16] During his rebuttal argument, the prosecutor told that jury, "you cannot infer just because [the drugs are] in the garage that it's his. If you start to add up all the other facts and circumstances in the case, you get to the point again that the circumstantial evidence in this case shows that it was in fact in his possession."
[17] The instructions define possession and then go on to state that "although mere presence of a person in the vicinity of contraband is not enough to support the element of possession, if the evidence demonstrates defendant was able to exercise dominion or control over the illegal objects, defendant can be convicted of possession. Equally, when an amount of readily useable drug [sic] is in close proximity to a defendant, this constitutes circumstantial evidence to support the conclusion that the defendant was in constructive possession of the drugs."
[18] As of January 1, 2008, sexual predator designation is governed by R.C. 2950.032. References to R.C. 2950.09(B)(3) in this decision are to the superseded statute still in effect at Cobb's 2007 trial and designation. *Page 1